489 F.Supp. 48 (1980)
UNITED STATES of America, Plaintiff,
v.
Glennon E. ENGLEMAN and Robert Handy, Defendants.
No. 80-0047CR (4).
United States District Court, E. D. Missouri, E. D.
March 14, 1980.
*49 Frederick R. Buckles and Richard L. Poehling, Asst. U. S. Atty., St. Louis, Mo., for plaintiff.
Michael T. Cady and Anthony J. Coultas, Richard B. Dempsey and Richard R. Vouga, St. Louis, Mo., for defendants.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court on defendants' separate pretrial motions. Defendants' motions for change of venue will be granted. Other pretrial motions will be disposed of after argument and consideration of evidence, where appropriate.
Defendants, Robert Handy and Glennon E. Engleman, have been charged with a seventeen-count indictment, alleging defendants' complicity in the deaths of Sophie Marie Barrera and Peter J. Halm, Jr. Count I charges defendant Engleman with a violation of 18 U.S.C. § 844(i), damaging a vehicle in interstate commerce by means of an explosive. Counts II through XVII charge defendant Handy and defendant Engleman with conspiracy and mail fraud in violation of 18 U.S.C. §§ 371 and 1341.
Defendant Handy and defendant Engleman now separately move for change of venue. Defendants contend that pretrial publicity has been so voluminous, prominent, and prejudicial as to deprive them of a fair and impartial trial in this district.
Rule 21(a) of the Federal Rules of Criminal Procedure provides for transfer if "there exists in the district where the prosecution is pending so great a prejudice against defendant that he cannot obtain a fair and impartial trial."
The trial judge has a nondelegable responsibility under Rule 21 of the Federal Rules of Criminal Procedure and the United States Constitution to insure that a defendant receive a fair and impartial trial. United States v. Marcello, 423 F.2d 993, 1004 (5th Cir.), cert. denied, 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970).
The population of the Eastern Division of the Eastern District of Missouri from which the jurors are selected is found principally in St. Louis City (population 622,237 in the 1970 census) and St. Louis County (population 951,353 in the 1970 census). In a criminal case (# 80-870) pending against defendant Engleman in the City of St. Louis, a change of venue has been granted to insure a fair trial.
In a criminal case (# 435-934) pending against defendant Engleman in St. Louis County, a change of venue has been granted to insure a fair trial.
In a criminal case (# 435-935) pending against defendant Handy in St. Louis County, a change of venue has been granted to insure a fair trial.
The St. Louis county prosecutor, during an evening news telecast on April 5, 1980, stated that the press release of a key witness's statement would not hurt the state's case. Considering the publicity so far, the prosecutor continued, this is one of the most notorious cases in recent years and he would have no objection to a motion for change of venue to insure an impartial trial.
All of this suggests an area-wide problem in finding a fair and impartial jury for these defendants in the Eastern Division of the Eastern District of Missouri where evidence indicates saturation coverage by the St. Louis media. It is doubtful that any literate veniremen are not aware of this case. Compare United States v. Hearst, 412 F.Supp. 873, 875-76 (N.D.Cal.1976).

When to Decide the Motions
The government argues that consideration of these motions to transfer is premature because the alleged prejudicial nature of publicity through local media can be appropriately questioned on voir dire.
A line of cases in the Eighth Circuit has reflected a preference that the determination *50 of applications for transfer for prejudice should await voir dire. E. g., United States v. Brown, 540 F.2d 364, 377 (8th Cir. 1976).
The Speedy Trial Act, 18 U.S.C. § 3161 et seq., granted defendants an additional bundle of rights and clarified legislative policy emphasizing an insistence upon prompt disposition of criminal matters. Otherwise, as a distinguished Chief Judge of a United States District Court, William B. Bryant, has said, the defendant may be compelled to suffer disgrace "for conduct not yet condemned in the courtroom."
Thus, while determination of whether widespread prejudice prohibits selection of an impartial jury can be made during voir dire, the impact of prejudicial publicity requires that "each case must turn on its special facts." Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959). In some cases, massive publicity may diminish the efficacy of voir dire in screening prospective jurors. E. g., United States v. Mandel, 415 F.Supp. 1033, 1065-76 (D.Md.1976).
Effective and economic judicial administration is not well served by calling an inordinate and unwieldy number of veniremen to see if an unbiased jury might be obtained, especially when it is already apparent that a substantial chance of intolerable prejudice exists. E. g., United States v. Carbone, No. CR78-93T (W.D.Wash. Jan. 26, 1979).
Although the government argues for awaiting voir dire, the Court finds that the logistics of trying this case are too great to wait until the eve of trial before reaching a decision on where the trial will be held. If the case is tried in this district (as opposed to another district removed from the intense publicity prevalent here), hotel accommodations must be reserved here promptly for jurors, alternates, their bailiff, and numerous witnesses. Transportation and lodging for witnesses, attorneys, and staff is a major undertaking in terms of planning time, expense, and inconvenience. These logistical problems, together with the problem of obtaining a suitable court facility, when combined with defendants' request for removal to another metropolitan area, severely limit the places to which this case can feasibly be transferred. Regardless of where the trial is held, planning must begin now to avoid extended delay beyond the time constraints imposed by law, and to avoid unnecessary expenditure of public monies in summoning hundreds of qualified veniremen for a panel which, in all likelihood, would not be used. A change of venue during voir dire would immeasurably increase the burden, expense, and inconvenience on all parties and the Court, and would result in unacceptable delay.

Nature and Extent of Publicity
It is important to the community and to the criminal process that the public be informed of the commission of crime and the manner in which trials are conducted. See Nebraska Press Assoc. v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), in which the Supreme Court strenuously disapproved restraints on the press. The exercise of first amendment rights by the news media is not questioned by this Court. This is their responsibility under the first amendment. It is the trial court's responsibility under the sixth amendment to insure a fair trial for the accused. See ABA Standards, Fair Trial and Free Press § 3.2 (1968).
During the period prior to trial, public statements originating from the news media that infer the guilt of the person charged, that include inadmissible evidence, or that serve to inflame the community, may undermine the judicial process. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), in which the Supreme Court found virulent, incriminating pretrial publicity made a fair and impartial trial impossible. Publicized facts may be untrue, confessions obtained may be inadmissible into evidence, and witnesses may substantially modify their stories under oath or after confrontation and cross examination. Thus, the right to a fair trial *51 may be substantially endangered by reporting prior to trial. The danger is especially acute when reporting extends to such matters as confessions or admissions, interviews of prospective witnesses, and speculation as to testimony or other matters to be introduced at the trial. Moreover, news media reports of a sensational or inflammatory character may adversely effect the atmosphere in which the case is tried, thus impeding the administration of justice. Prejudicial publications can create a substantial risk that a mistrial will be declared or a conviction reversed.
In considering a motion for change of venue, the Court may base its determination on its own evaluation of the nature, frequency, and timing of the material involved. See ABA Standards, supra.
In his motion for a change of venue, defendant Handy filed with the Court copies of newspaper articles which appeared in the major St. Louis media. The headlines include "Murdered Man's Wife Gives Data On Role In Plots" and "Dentist Is Suspect In Other Killings." An article headlined "Widow Tells Of Plot To Kill Halm" appeared on the front page of the weekend St. Louis Globe Democrat on April 5-6, 1980.
The Court conducted a hearing on this matter on April 18, 1980. The defendants presented further evidence of newspaper articles and transcripts of radio and television broadcasts, all on the subject of the state and federal criminal charges presently pending against these defendants. Evidence included the geographic area and readership which are served by the media.
Reviewing the barrage of publicity, the Court finds specific testimony of essential witnesses has been outlined in the media. The nature of the evidence publicized has included areas of particular sensitivity. See Appendix.
This cause is set for trial on May 6, 1980. The Court finds that the wide dissemination of inflammatory publicity shortly before trial has created an atmosphere of pervasive public prejudiceso great that it is impossible for the defendants to obtain a fair trial at any place fixed by law for holding court in the Eastern District of Missouri. If the Court did not grant defendants' separate motions for change of venue, this cause would begin with built-in grounds for reversal. See United States v. Marcello, supra.
The publicity is not abating. It will continue as trial approaches and the Court anticipates most of the problems which besieged the trial judges in United States v. Polizzi, 500 F.2d 856 (9th Cir. 1974), cert. denied, 419 U.S. 1121, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); Silverthorne v. United States, 400 F.2d 627 (9th Cir. 1968), cert. denied, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971); and United States v. Hearst, 412 F.Supp. 873 (N.D.Cal.1976). While conceivably the Court might handle some of these problems with in camera proceedings and press restraints, this Court is most reluctant to impose first amendment restrictions on the media in a matter engendering such intense public concern.
Therefore, defendants' separate motions for change of venue will be granted.

Conclusion
Rule 21(c) of the Federal Rules of Criminal Procedure provides for transfer of a cause to any district, whether or not said district is specified in defendants' motion. The government resists such transfer as premature, and neither defendant in their written motions specified any district as appropriate for such transfer. In oral argument, defense counsel for defendant Engleman suggested a metropolitan area such as Kansas City, Missouri, would be appropriate. The Court has broad discretion in choosing where to transfer a cause. See United States v. Angiulo, 497 F.2d 440 (1st Cir.), cert. denied, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974); United States v. Marcello, supra.
After having examined the pleadings, considered the evidence, the authorities cited, *52 and having heard arguments of counsel, now, therefore,
Upon execution of a written consent by each defendant, together with the statement in open Court of counsel for each defendant that each has fully informed his client as to his constitutional rights and the effect of waiver implicit in these motions for change of venue, the Court will enter its order transferring this cause from the Eastern Division of the Eastern District of Missouri at St. Louis to the 3rd or 4th Division of the District of Minnesota.

APPENDIX
The prejudicial nature of extensive publicity in this case is reflected by the following newspaper quotes:
1. "Peach Says He'll Seek Death Penalty Against Engleman In Bombing." On the front page of the March 15-16, 1980, weekend edition, the St. Louis Globe-Democrat quoted Circuit Attorney Peach:
Peach praised The Globe-Democrat's disclosures printed before Engleman's arrest, saying, "You went a long way to stir things up."
"The Globe-Democrat stories got Engleman's lips open on the tapes. The Globe-Democrat did a public service," Peach said.
Peach referred to Engleman's reaction to Globe-Democrat stories as reflected in taped conversations with Informant X Ruth Marilyn Engleman, Engleman's former wife. The conversations were recorded without Engleman's knowledge.
2. "U.S. Seeks Indictment on Dentist." On the first page of the March 1-2, 1980, weekend edition, St. Louis Globe-Democrat reported:
Even though state capital murder charges have been filed, federal charges may be pursued first in order to take advantage of testimony from Informant X, according to informed sources.
. . . . .
Under Missouri law, informants can refuse to testify by raising the constitutional rights against self-incrimination at any state criminal proceeding. But informants can be granted full immunity from federal prosecution in exchange for testimony before a federal grand jury or during a federal criminal trial.
Under federal law, if granted immunity from prosecution, the informant must testify, and testify truthfully, or face prosecution for not doing so.
3. "Engleman Pleads Innocent Of Bombing And Conspiracy." On March 20, 1980, the St. Louis Post-Dispatch quoted U. S. Attorney Robert D. Kingsland:
Kingsland said he expects that Engleman and Handy will be tried on the federal charges before the state charges because the U. S. Attorney's office has granted Engleman's ex-wife, Ruth Marilyn Engleman a key witness in the caseimmunity from prosecution. Missouri law has no provision for witness immunity.
4. "Widow Tells Of Plot To Kill Halm." The front page article of the April 5-6, 1980, weekend edition of the St. Louis Globe-Democrat, quoted portions of Carmen Miranda Halm's statement to police officials. On page 6, at the conclusion of the lead article, the newspaper reported "Westfall Says Halm's Widow Won't Be Tried."
Faced with Globe-Democrat disclosures concerning Carmen's admissions in the crime, St. Louis Prosecuting Attorney George R. "Buzz" Westfall said the reason she will not be prosecuted is that her testimony is needed to convict Engleman.
. . . . .
"It's difficult for the public to understand why one murderer gets off the hook while the state goes after another murderer. But the fact of the matter is that sometimes the state is in a position to either make a deal with one criminal or else run the risk of losing both," Westfall said.
The exhibits filed in this case are replete with examples of similar and even more *53 prejudicial material broadcast as well as published throughout the St. Louis area.