No. 82-353

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

THE STATE OF MONTANA, ex rel.,
DANIEL CHRISTOPHER COBURN,

Relator,

-vs-

THE HONORABLE GORDON R. BENNETT,
DISTRICT JUDGE OF THE FIRST JUDICIAL
DISTRICT OF THE STATE OF MONTANA, IN
AND FOR THE COUNTY OF LEWIS & CLARK,

Respondent.

---

ORIGINAL PROCEEDING:

For Relator:

Jackson Law Firm; Gregory Jackson, Helena, Montana

For Respondent:

Charles Graveley, County Attorney, Helena, Montana

---

Submitted on Briefs: September 23, 1982

Decided: December 23, 1982

Filed: DEC 23 1982

_____
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This matter comes before us on a petition for writ of supervisory control. In issuing the writ, we assumed jurisdiction over a single issue in this cause: Did the District Court abuse its discretion by refusing to grant relator's motion for a change of venue? We find that the refusal to grant the motion was an abuse of discretion under the facts of this case.

On May 20, 1982, R.H., an eleven-year-old Helena schoolgirl, reported that she had been abducted and sexually assaulted while on her way to school that morning. R.H. provided police with a description of her assailant and the vehicle used in the abduction. Later that day police located the vehicle at the home of Daniel Coburn's parents. Coburn, who was visiting his parents, was contacted and agreed to go to the sheriff's department for questioning. Sometime after his arrival at the sheriff's office, Coburn allowed officers to take a photograph of him for use in a photo lineup. R.H. identified Coburn's picture from amongst those in the photo array. Coburn was then arrested and charged with aggravated kidnapping and sexual intercourse without consent.

On May 21, 1982, Coburn was brought before a justice of the peace for his initial appearance. Bail was set at $100,000. Later that same morning Coburn was brought before District Judge Gordon Bennett, whereupon his bail was reduced to $15,000. Coburn's parents furnished bail by using their residence as security, the unencumbered value of which was twice the amount of the bail as required by section 46-9-401(2), MCA. Coburn was released sometime in the early afternoon of May 21, 1982. It was at this point that public

sentiment toward relator Coburn began to manifest itself. The exhibits and affidavits attached to relator's motion for change of venue show the following facts.

The arrest of Coburn was front-page news in the Independent Record, the only daily newspaper in Lewis and Clark County. The article about Coburn's arrest was entitled, "Helenan Charged With Rape," and was accompanied by a front-page photograph of Coburn being led from the jail to the courthouse by two sheriff's deputies. It appears in the photograph that Coburn's hands are bound behind his back. The article reported that, "Sheriff Chuck O'Reilly said this morning he expected Coburn to be bailed out of jail at any time. He said his reaction to Bennett's action lowering bond was 'unprintable--and you can print that.'"

A second article in the May 21 Independent Record was headlined "Help From Young Victim Amazed Helena's Police." The article read as follows:

> "County Attorney Charles Graveley was shaking his head in wonder.
>
> "'When you read her statement,' he said of Thursday's 11-year-old rape victim, 'you'd think she was 28 or 29, and well-educated at that.
>
> "'It's the best statement from a rape victim I have seen in five years,' he said.
>
> "Assistant County Attorney Steve Garrison had another way of putting it this morning.
>
> "'He picked the wrong little girl,' he said. 'She's the kind that when you say, "describe the vehicle," she just does it.'
>
> "Graveley, Sheriff Chuck O'Reilly and Police Chief Bill Ware all credited the young victim's careful descriptions of her assailant and his pickup truck for their officers' speedy arrest of the

-3-

suspect, 29-year-old Daniel Coburn of Leisure Village.

"Even as worried as Central School officials were warning students about strangers, and sending notes home advising parents to do the same, officers aided by the victim's tellingly detailed descriptions were zeroing in on the suspect.

"The girl's statement, written in her neat handwriting about four hours after the incident, is revealing. The grim facts, detailed in logical sentences of perfectly spelled words, were laid out in careful chronological order. With the exception of the last few numbers of her assailant's license plate, few details escaped her attention.

"Those details made for a compelling case during this morning's court hearing to show probable cause that Coburn committed the crime.

"For instance, the girl's description of the suspect--from the dark hair hanging over his beard-stubbled face to the brown corduroy pants, striped t-shirt, yellow and brown plaid jacket, white tennis shoes and dark sunglasses--exactly matched the appearance and clothing of the defendant, officers said.

"So did the small brown pocket knife she said was held by her assailant. It was found in Coburn's pickup.

"Her description of the pickup, a yellow Subaru Brat, included a dark stripe on the side of the truck's bed, plaid seat covers, a blue stick-shift handle, a brown vinyl dashboard, and the word 'Brat' and rainbow-type stripes near the window. All of it checked out as matching the suspect's vehicle.

"Graveley said the girl also was able to describe most of the route to the Davis Gulch scene of the assault in spite of being told to duck down, as well as many details about the area where she was assaulted, and she was able to tell officers where her finger prints could be found on the pickup.

"Graveley said small prints were found at those sites, but have not yet been matched with the victim's prints.

-4-

"Although the girl was described as being 'nearly hysterical' immediately after she had been released, Graveley said she was composed later in the day and appeared to be standing up well to her ordeal. He said she was a 'very cooperative little girl' who was getting 'tremendous support from her family.'

"Graveley said that as the suspect was being arraigned this morning, the young victim was at home asleep."

At 4:00 p.m. on May 21 a group of over 300 demonstrators gathered on the courthouse lawn. The Independent Record reported the demonstration in its Saturday morning edition. The large front-page headline read: "Angry Mob Resists Judge's Arguments." Three photographs accompanied the portion of the article which was on the front page. One was of the demonstrators on the lawn; one was of a demonstrator speaking with Judge Bennett; and one was of defendant Coburn. A fourth picture of other demonstrators was on an inner page. The article described the situaton as an "angry confrontation" between Judge Bennett and an "outraged crowd" --"protests of a magnitude unprecedented in recent memory." The crowd was described as "leaderless but united by fear for their children and by their anger at Bennett." Twenty police officers were on hand when the protestors were allowed to enter the courthouse to meet with Judge Bennett. The crowd booed the judge when he arrived to speak with them. When Judge Bennett tried to explain bail laws, the Independent Record reported that, "[m]embers of the judge's angry audience weren't impressed, insisting again and again that Coburn clearly was too dangerous to be freed. Many said the constitutional provision regarding excessive bail should be changed. All cheered loudly when Graveley said it was his opinion that $100,000 bail to keep Coburn in jail

-5-

to protect the community was legally proper."

On Sunday, May 23, the Independent Record carried a front-page article headlined, "Accused Rapist Free on Bail[;] Parents Still Angry at Sunday School Teacher's Release." The article was accompanied by a photograph of a large advertising sign at a Helena service station. The photograph was printed on the front page; the sign read, "JUDGE BENNETT IS WRONG." The photo was captioned, "[T]his sign at the Exxon station on Cedar Street exemplified continuing sentiment for the 11-year-old girl." The article described Coburn as "the man who sparked fear and outrage in hundreds of Helenans." The article was essentially a reiteration of the previous day's story, and included the comment, "[t]hat Coburn has not been confined might add more fuel to the outrage that caused the greatest spontaneous outpouring of anger in Helena in recent memory."

On May 25, 1982, the Independent Record published an editorial entitled, "Bail Issue Isn't Easy to Resolve." The editorial stated that the defendant's bail was reduced to $15,000, "enabling him to post bond and roam free until his next court appearance."

A front-page article in the Independent Record on May 26 was headlined, "Rape Case Spurs Helena Activism." The story was a report on a panel discussion on the subject of sex offenders and the law which was held at a Helena elementary school. The Lewis and Clark County Attorney was one of the panelists. The article said that:

> "[Coburn] is at Warm Springs State Hospital for a mental evaluation to determine if he should plead innocent by reason of insanity.
>
> "The rape incident clearly led to Tuesday

night's three-hour meeting, but panelist County Attorney Charles Graveley told the group early on that the specifics of the case could not be discussed because Coburn has a right to fair trial.

"In response to an audience question, however, Graveley confirmed that a defendant who was found to be insane can be 'turned loose' after 180 days at a mental institution such as Warm Springs, if a psychiatrist says he is ready to leave.

"'Once he's found insane, he virtually has a license to commit another crime and another crime and not go to prison,' Graveley said."

The Independent Record carried reports on two organizations which grew out of the Coburn incident and the panel discussion on sex offenders. A committee was formed to find a write-in candidate to run against Judge Bennett in the June 8 primary election. Judge Bennett was unopposed in his re-election campaign. A group called Citizens to Change Criminal Laws was also formed. According to the Independent Record, the members of Citizens to Change Criminal Laws were "upset that concern for the rights of criminal offenders has overshadowed the right of society to be protected." The goals of the group were "to research and study and then propose changes to existing state law on child molestation, rape, insanity and bail." County Attorney Graveley spoke to the group on at least one occasion. The newspaper reported that, "Graveley said he was present 'only to give information and not as an advocate.' He said his major complaint was that judges pay more attention to the legal requirement that the bail must consider the ability of the accused to pay than another requirement that bail should be commensurate with the nature of the offense."

On Wednesday, May 26, 1982, an act of vandalism asso-

ciated with the Coburn case occurred in the Helena area. The word "RAPE" was painted with stencils and white paint beneath the "STOP" on sixty Helena stop signs. Photographs of the "STOP RAPE" signs appeared three times in the Independent Record. Two of the photographs were cropped and only the octagon with "STOP RAPE" displayed upon it was printed. One of these cropped photos was printed with a front-page article; the other accompanied an editorial. A letter was sent to the Independent Record in which the author, who claimed to represent the "Women of Helena," said that she and others painted the signs because of the rape of R.H. The newspaper quoted the letter as reading, "[w]e resent the ignorance and lack of commitment by all officials to act on this immoral and heinous crime of rape. . . We will not be silent any longer. Those in power must recognize our power as we have been forced to recognize yours." The newspaper also said the letter stated that "the Women of Helena will continue to take matters into their own hands as long as 'the system continues to ignore our concerns.'"

Coburn was arraigned on July 19, 1982. The Independent Record gave front-page coverage to his arraignment under the headline, "Innocent, Coburn Says." A large picture of Coburn was run with the article. The article reported that, "[s]ince his arrest, Coburn and his wife, Barbara, have moved out of their Leisure Village trailer home to avoid reprisals." Affidavits submitted to the District Court by Coburn and his parents state that Coburn and his wife were forced to move to avoid reprisals; that when Coburn tried to move his mobile home to a different trailer park, the residents of the new park complained to the manager and Coburn

was prevented from moving to the new park; and that Coburn received death threats from persons who called at the residence of his relatives, the home to which he moved after prosecution of the case began.

Relator appended to his motion for change of venue many "letters to the editor" which were published by the Independent Record. The letters which condemned Judge Bennett's reduction of Coburn's bail contained comments such as these: "We further wish to express our unhappiness with the inadequacy of a judicial system which all too often favors the rights of the perpetrators of crimes instead of the rights of the victims" (written by the president of the Helena Education Association); "I read that the man indentified in this crime is back on the streets in less than 24 hours;" "[a]t least I know the name and face of this suspect . . . Our county attorney appears to have an abundance of evidence with which to prosecute this particular case;" "[o]ne would hope that the suspect would not be immediately free to possibly strike again;" "[h]ow dare you [Judge Bennett] make a mockery of the incredible effort by the child who provided Charles Graveley with the best statement he has heard from a rape victim in five years." A number of letters were published which supported Judge Bennett's reduction of bail. Even some of those carried the implication that Coburn had committed the crime with which he was charged.

County Attorney Graveley was campaigning for re-election during the pendency of the Coburn case. The Independent Record ran a "Candidates Say" section in which candidates were provided space to speak out on the issues.

In one such section, Graveley was quoted as saying:

> "'How many times have we heard of crimes
> being committed by persons while out on
> bail facing serious charges? If one were
> to follow the rationale that bond must be
> set in an amount the defendant can
> afford, no one would be held before a
> conviction was had, because if he cannot
> afford bail, he should be released on his
> own recognizance. This is not contem-
> plated by the law and I can't agree with
> those who espouse such philosophy.

> "'The bail in serious crimes must be set
> sufficiently high to insure that the
> <u>defendant</u> is not going to <u>commit any more</u>
> <u>crimes</u> against our citizens while await-
> ing trial on the former charge.'"
> (Emphasis supplied.)

All of the information which we have outlined above
was before the District Court when it ruled upon relator's
motion for change of venue.

A criminal defendant is guaranteed the right to a
trial by an impartial jury. U.S. Const. amend. VI; Montana
Const. art. II, § 24. In essence, the right to a jury trial
guarantees to the criminally accused a fair trial by a panel
of "indifferent" jurors. Irvin v. Dowd (1961), 366 U.S.
717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755. A
failure to accord an accused a fair hearing violates even
minimal standards of due process. In re Oliver (1948), 333
U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682. A defendant or the
prosecution may move for a change of place of trial on the
ground that there exists in the county in which the charge
is pending such prejudice that a fair trial cannot be had
there. Section 46-13-203(1), MCA. A motion for change of
venue is addressed to the discretion of the trial court and
a denial is not error in the absence of an abuse of discre-
tion by the trial court. State v. Kirkaldie (1978), 179
Mont. 283, 291, 587 P.2d 1298, 1303.

It is important to note that relator did not allege in his motion for change of venue that prejudice existed solely as a result of prejudicial publicity. Therefore, the "indicia of denial of fair trial" resulting from prejudicial publicity which were first denominated in State v. Board (1959), 135 Mont. 139, 143-144, 337 P.2d 924, 927, need not control our resolution of the venue question now before us. Every application for change of venue must be determined by the facts and circumstances presented by it; no general rule can be laid down. State v. Spotted Hawk (1899), 22 Mont. 33, 53, 55 P. 1026, 1031. In analyzing the facts, we must consider all of the indications of prejudice. State v. Bashor (1980), ____ Mont. ____, 614 P.2d 470, 476, 37 St.Rep. 1098, 1102.

An analysis of the facts in a change of venue case in Montana is no longer directed toward a determination of whether there has been a showing of prejudice substantial enough to make a fair trial impossible. Since our decision in State v. Link (1981), ____ Mont. ____, 640 P.2d 366, 368, 38 St.Rep. 982, 985, "[t]he rule is that an accused is entitled to a change of venue when it appears that there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial."

In his brief relator contended that there are aroused feelings in the community, that there is a threat to the personal safety of relator, that newspaper articles have consisted of more than objective dissemination of information, that the established opinion of the community is that

-11-

relator is guilty, and that it will be difficult or impossible to secure a fair and impartial jury.

We find that the exhibits and affidavits which relator attached to his brief in support of motion for change of venue supply reasonable grounds to believe that the prejudice alleged by relator actually exists. Angry citizens marched on the courthouse. Public meetings were held, out of which grew organizations devoted to removing the judge who lowered relator's bail and to dealing with persons who commit sex crimes. Vandalism occurred and threats were made against relator. While coverage of the case by the Independent Record was far less offensive than that in Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, on several occasions the newspaper went beyond an objective dissemination of information. Instead of calming an enraged community and providing an atmosphere in which the processes of justice could go forward without bias, the Independent Record inflamed an already angry populace. In addition, comments made to the Independent Record by Sheriff O'Reilly, County Attorney Graveley and Deputy County Attorney Garrison were prejudicial to relator.

In State v. Williams (1979), _____ Mont. _____, 604 P.2d 1224, 1227, 36 St.Rep. 2328, 2331, this Court said that "[e]xtrajudicial statements by prosecutors and law enforcement personnel prejudicial to defendant and which are disseminated in the news media prior to trial may under some circumstances destroy the impartiality of prospective jurors." The comment by Sheriff O'Reilly that his reaction to a reduction of bail for relator was "unprintable" clearly implied a belief that relator is guilty and dangerous.

-12-

County Attorney Graveley's campaign statement that bail should insure that "the defendant is not going to commit any more crimes" shows a total disregard for the fundamental constitutional protection embraced by the concept of presumed innocence, and under the circumstances implies that relator is guilty.

Perhaps most troublesome are the statements by Graveley and Deputy County Attorney Garrison which were printed in the article entitled, "Help from Young Victim Amazed Helena's Police." Garrison's comment that "he picked the wrong little girl" is an obvious statement of opinion as to the guilt of relator. Graveley commented that the statement of eleven-year-old R.H. sounded like it was written by a well-educated twenty-nine-year-old and that it was the best statement he had obtained from a rape victim in five years. Given the problems of credibility associated with the testimony of youthful witnesses, such a comment by the County Attorney could only serve to enhance the credibility of R.H.

Disciplinary Rule 7-107 of the Canons of Professional Ethics relates to trial publicity and states in pertinent part that:

> "(B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:
>
> ". . .
>
> "(5) The identity, testimony, or credi-

-13-

bility of a prospective witness.

"(6) Any opinion as to the guilt or inno-
cence of the accused, the evidence, or
the merits of the case."

The Canons were adopted in order to maintain absolute
confidence in the integrity of the Bar and to insure the
efficient and impartial administration of justice. We
believe that the failure of the County Attorney and the
Deputy County Attorney to strictly adhere to the dictates of
DR 7-107(B)(5) and (6) has jeopardized the impartial admin-
istration of justice to relator by contributing to the
establishment of prejudice against relator. We also ques-
tion the wisdom and propriety of the County Attorney appear-
ing at public meetings which were spawned by the crime with
which relator is charged. The issues which the County
Attorney addressed at these meetings bore upon the public's
perception of relator's guilt or innocence. The fact that
his comments were couched in general terms does not elimin-
ate their prejudicial effect.

The respondent argues that voir dire is the proper
time to determine whether the prejudice which we have
outlined still existed at the time set for trial and that it
is premature for this Court to resolve the question on a
writ of supervisory control. We disagree. Not every venue
case requires that voir dire be employed to determine
whether prejudice still "exists and that by reason of the
prejudice there is a reasonable apprehension that the
accused cannot receive a fair and impartial trial." While
the determination of whether widespread prejudice prohibits
selection of an impartial jury is usually made during voir
dire, each case must turn on its special facts. United

-14-

States v. Engleman (E.D. Mo. 1980), 489 F.Supp. 48. It is widely recognized in the federal courts that while voir dire is usually essential to resolution of a venue question, a motion for change of venue may be decided prior to voir dire if the circumstances of the case indicate inherent prejudice. United States v. Mandel (D. Md. 1976), 415 F.Supp. 1033, 1067-1072. "Effective and economic judicial administration is not well served by calling an inordinate and unwieldy number of veniremen to see if an unbiased jury might be obtained, especially when it is already apparent that a substantial chance of intolerable prejudice exists." Engleman, supra, 489 F.Supp. at 50.

Beyond the question of judicial economy lie the problems inherent in the voir dire system itself. Justice Holmes said in Frank v. Mangum (1915), 237 U.S. 309, 349, 35 S.Ct. 582, 595-596, 59 L.Ed. 969, 989 (dissenting opinion), that "[a]ny judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere." The courtroom can exert a unique pressure upon a juror or prospective juror which may render that person's degree of impartiality indiscernible even to himself. As the United States Supreme Court said in Irvin v. Dowd (1961), 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751, 759: "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father." Our Court has recognized this problem at least since State v. Spotted Hawk (1899), 22 Mont. 33, 56, 55 P. 1026, 1032:

> "The fact that a jury was obtained in Custer county, that answered all the

statutory requirements, after an examination of 65 veniremen only, is not at all conclusive upon the question of the existence of such a prejudice in the community as to render a fair and impartial trial impossible. 'This is not the test to be applied to the question, for such a jury might be found when the public sentiment was in a blaze of excitement and passion against one of the parties to the action; and the pressure of this public sentiment might make itself felt during the trial, in very many ways, upon the jury, upon the witnesses and officers of court, and upon the court itself. Jurors, witnesses and officers cannot be insensible to a strong and excited public feeling and sentiment concerning the trial that is going on, and are liable to be influenced by it, unconsciously, and with an honest intention of doing their whole duty. The court room is a public place, and a trial, in which a community is deeply interested, brings the people there; and the pressure of their presence and feeling is a strong argument, and almost irresistible, one way or the other. The influence of their presence, and the expression of their interest in the event of the trial, in divers ways, might give a false coloring to the testimony, or warp and bias the judgment in weighing and considering it.' [Citing Kennon v. Gilmer (1885), 5 Mont. at 264, 5 P. at 850.]"

We conclude that the prejudice which the record reveals was still in existence at the time set for trial. The trial was set for September 27. The campaign to remove Judge Bennett was entering its final stage at this time. Given the prominent place the Coburn case occupied in this campaign and considering the nature and intensity of the feelings which the case aroused, we fail to see how public sentiment could have diminished in a community as small as Helena. Further, we hold that by reason of the prejudice there is a reasonable apprehension that relator cannot receive a fair and impartial trial in Lewis and Clark County.

-16-

Our assumption of jurisdiction is not premature. "[O]ur system of law has always endeavored to prevent even the probability of unfairness." In re Murchison (1955), 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946. If, upon presentation of a matter to us by means of a writ, it is apparent from the record that a relator will be deprived of a fundamental right, both justice and judicial economy require that we then resolve the issue in favor of relator.

The District Court abused its discretion by refusing to grant relator's motion for a change of venue. The order of the District Court is reversed. The District Court shall conduct a hearing to determine whether the matter shall be resolved by transferring the case to a county in which a fair trial may be had, or by directing that a jury be selected in a county where a fair trial may be had and then returned to Lewis and Clark County for trial. Section 46-13-203(3), MCA.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice John Conway Harrison dissenting.

I would deny the change of venue and allow the trial court to go ahead with the trial in this county to see if sufficient jurors can be qualified to sit. If, after calling a number of jurors, the court found that prejudice was sufficient to warrant a change of venue, then I would leave that decision to his discretion. In my opinion, the question of a change of venue should remain in the hands of the trial judge.

_____
Justice