No. 90-373

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

STATE OF MONTANA,

       Plaintiff and Respondent,

-v-

EUGENE WILBUR BOUSQUET,

       Defendant and Appellant.


APPEAL FROM:   District Court of the Third Judicial District,
               In and for the County of Powell,
               The Honorable Mark P. Sullivan Judge presiding.


COUNSEL OF RECORD:

       For Appellant:

              C.F. Mackay; Public Defender Project Office; Anaconda, Montana

       For Respondent:

              Marc Racicot, Attorney General; Deanne L. Sandholm, Assistant Attorney General; Helena, Montana
              Christopher G. Miller; Powell County Attorney; Deer Lodge, Montana

Submitted on Briefs: February 7, 1991

Decided: April 2, 1991

FILED

Filed: APR - 2 1991

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Eugene W. Bousquet appeals from the unanimous verdict of a twelve-member jury sitting in the District Court of the Third Judicial District, Powell County, Montana, Judge Mark Sullivan presiding. The jury found Bousquet guilty of possession of a deadly weapon by a prisoner, a felony. We affirm.

Bousquet presents the following issues:

1. Did the District Court err in denying Bousquet's motion for a change of venue?

2. Was the evidence sufficient for the jury to conclude that Bousquet was guilty of possession of a deadly weapon by a prisoner?

Eugene W. Bousquet, an inmate at Montana State Prison in Powell County, was housed in upper A4 cell in the maximum security area of the prison. Inmates housed in A Block were allowed only minimum personal belongings, reading material, personal papers, writing materials, and hygiene items.

In the early morning hours of April 3, 1989, a correctional officer noticed that an inmate, who was not Bousquet, had a "passing string" in his possession. A "passing string" is a piece of sheet torn into strips or a collection of socks tied together used to pass items from one cell to another. The officer requested the inmate to give the passing string to him. When the inmate refused, the officer warned the inmates to stop running items. When an officer went into the area, he was greeted with a general disturbance of inmates banging, yelling, and kicking doors.

At this point, an officer called the shift sergeant who

2

ordered a response team into the area. When a response team went into the area, the inmates reacted with more banging and yelling and used their shampoo bottles to squirt liquid at the officers through the cracks of the cell doors. The response team decided to do a "shakedown." During a shakedown, each prisoner is asked to put his hands through the food door of his cell to be handcuffed, the prisoner is removed from his cell, and the cell is searched for weapons or contraband of any sort.

Bousquet's cell was the third cell the officers "shook down." Bousquet refused to put his hands through the slot to be handcuffed. Officers testified that they could see that Bousquet was holding a wet towel with a large knot at the end of it and a homemade knife, a "shank," in his right hand. Bousquet would not drop the items when requested.

One of the officers called the Command Post and asked for an officer to bring mace. Bousquet, swinging the wet towel, refused to comply with several requests to drop the weapons, and the mace was sprayed in Bousquet's face. According to correctional officers, when the mace was used, the shank dropped to the floor, was picked up by one of the officers, and given to Captain DeYott who placed the shank in the evidence locker. No attempt to identify fingerprints on the shank was made, since several officers had seen Bousquet with the shank.

Bousquet testified that he never possessed a shank in his cell. According to the testimony of another inmate, the inmate heard officers in Bousquet's cell saying that they "were going to

3

fix his [Bousquet's] butt" and saw one of the officers place a shank under Bousquet's mattress and then pretend to find it.

As a result of the incident, Bousquet was charged with possession of a deadly weapon by a prisoner. Bousquet's motion for change of venue was denied on August 24, 1989. After a three-day trial, a jury found Bousquet guilty on September 7, 1989. The District Judge sentenced Bousquet to ten years in Montana State Prison, to be served consecutively to the sentence Bousquet was already serving. From the jury's guilty verdict, Bousquet appeals.

I

The first issue is whether the District Court erred in denying Bousquet's motion for a change of venue. Bousquet contends that the District Court should have granted his motion for a change of venue pursuant to § 46-13-203, MCA, which provides in relevant part:

> The defendant or the prosecution may move for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in such county.

Section 46-13-203(1), MCA. According to Bousquet, he could not have had a fair trial in Powell County for two reasons: (1) formation of Citizens Protective Association in Powell County, publicized in local newspapers; and (2) location of Montana State Prison in Powell County and near the town of Deer Lodge, areas of small population. Bousquet claims that the citizens of Powell County, exposed over the years to disturbances at the prison involving inmates and escaped prisoners, have become prejudiced, consciously or subconsciously, against prison inmates. Bousquet

4

asserts that the formation of Citizens Protective Association demonstrates the prejudice of Powell County residents.

The standard for a showing of prejudice pursuant to § 46-13-203(1) is set forth in State v. Link (Mont. 1981), 640 P.2d 366, 38 St.Rep. 982:

> "[T]he rule is that an accused in entitled to a change of venue when it appears there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial."

Link, 640 P.2d at 368, 38 St.Rep. at 985 (quoting People v. Berry (Ill. 1967), 226 N.E.2d 591, 592-93). A district court's denial of a motion for change of venue is not in error absent abuse of discretion by the district court. State ex rel. Coburn v. Bennett (1982), 202 Mont. 20, 29, 655 P.2d 502, 506.

Each motion for change of venue must be determined by the facts and circumstances of the particular case. Coburn, 202 Mont. at 29-30, 655 P.2d at 507. The facts of this case are similar to those in State v. Ritchson (1982), 199 Mont. 51, 647 P.2d 830. Ritchson moved for change of venue from Powell County because "during the past two years there has been an unusual number of escapes from the state prison and because of the anxiety which has been created from this situation a citizens protective association was reorganized . . . ." Ritchson, 199 Mont. at 54, 647 P.2d at 832. Ritchson claimed that the media attention given to the citizens' group resulted in a "poison atmosphere in the community."

A defendant seeking a change of venue because of adverse publicity must show (1) the news reports were inflammatory; and (2)

5

the news reports actually inflamed the prejudice of the community to an extent that a reasonable possibility exists that the defendant may not receive a fair trial. State v. Miller (1988), 231 Mont. 497, 504-505, 757 P.2d 1275, 1280; Ritchson, 199 Mont. at 54, 647 P.2d at 832.

As in Ritchson, neither test was met here. Bousquet has not produced the news articles to which he refers and has not alleged any prejudicial statements or publicity directed at Bousquet personally. During voir dire of the jury panel, Bousquet's counsel thoroughly and expertly questioned potential jurors and challenged for cause any potential jurors who had a connection with Montana State Prison or other possible prejudice. The District Court excused all those challenged for cause by defense counsel. Since no reasonable grounds existed to support Bousquet's claim of actual prejudice, we hold that the District Court did not err by denying Bousquet's motion for change of venue.

II

The second issue presented by Bousquet is whether the evidence was sufficient for the jury to conclude that he was guilty of possession of a deadly weapon by a prisoner beyond a reasonable doubt. The test for sufficiency of the evidence in a criminal case is whether the evidence, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Kaczmarek (1990), 243 Mont. 456, 461, 795 P.2d 439, 442; State v. Holman (1990), 241 Mont. 238, 241, 786 P.2d 667, 669.

In order to find Bousquet guilty of possession of a deadly weapon, the jury had to find that all three elements existed beyond a reasonable doubt: (1) the individual charged was a prisoner; (2) the individual knowingly possessed, actually or constructively, a deadly weapon at the time shown in the information; and (3) the individual possessed the weapon without lawful authority. Section 45-8-318, MCA. A review of the record shows sufficient evidence for a jury to find each of the elements beyond a reasonable doubt.

Bousquet points out that Bousquet denied having a shank in his cell and that another inmate testified that the shank was planted by correctional officers. The jury is the exclusive judge of a witness' credibility. While a witness is presumed to speak the truth, the presumption can be overcome by any number of factors, including the demeanor of the witness while testifying, the character of the witness' testimony, the bias of the witness, the extent of the witness' opportunity to perceive the event, and other evidence contradicting the witness' testimony. Section 26-1-302, MCA. We note that later testimony made questionable the other inmate's ability to observe what occurred in Bousquet's cell.

Bousquet also argues that some of the incident reports omitted mention of the shank. Omission of mention of the shank in some of the reports does not prove that a shank was not found. Three correctional officers testified that they saw the blade of a shank in Bousquet's hand at the time shown in the information. Testimony also established the chain of custody of the shank from the time it was picked up from the floor of Bousquet's cell.

7

We hold that sufficient evidence supported the jury's verdict that Bousquet was guilty of possession of a deadly weapon by a prisoner beyond a reasonable doubt.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices