No. 87-261

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

THE STATE OF MONTANA,

        Plaintiff and Respondent,

-vs-

KENNETH ALBERT MILLER,

        Defendant and Appellant.

---

APPEAL FROM: District Court of the Fifth Judicial District,
In and for the County of Jefferson,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Edmund F. Sheehy, Jr., Cannon and Sheehy, Helena, Montana

    For Respondent:

        Honorable Mike Greely, Attorney General, Helena, Montana
        John P. Connor, Jr., Assistant Attorney General
        Richard J. Llewellyn, County Attorney, Boulder, Montana

---

        Submitted: March 2, 1988

        Decided: May 4, 1988

Filed: MAY 4 - 1988

*Ethel M. Harrison*

_____
Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Kenneth Albert Miller (Miller) appeals his conviction by jury trial and denial of his motion for a new trial. The Fifth Judicial District Court, Jefferson County, Montana, sentenced Miller to a 180-year sentence, 75 years on two counts of deliberate homicide under the felony murder rule, 20 years for robbery, and 10 years for felony assault by accountability. We affirm.

The issues we are presented with are stated as follows:

1. Did the District Court err in failing to grant Miller's motion for a change of venue?

2. Did the District Court err in limiting the introduction of character evidence pertaining to codefendant Sean Wentz?

3. Did the District Court err in denying Miller's motion to dismiss at the close of the State's case-in-chief?

4. Did the District Court err in disallowing Miller from cross-examining Wentz on the basis of a report prepared for the defense but not supplied to the State?

5. Did the District Court err in disallowing introduction of Exhibit 1 which portrayed Miller's version of the crimes?

6. Was the jury verdict supported by sufficient evidence?

7. Was Miller properly sentenced by the District Court?

8. Did the District Court err in classifying Miller a "Dangerous Offender"?

9. Did the District Court err in denying Miller's motion for a new trial?

10.   Should Miller be eligible for parole in 17½ years?

Miller was charged by amended information with four counts of deliberate homicide under § 45-5-102(1)(a) and (b), MCA; robbery, § 45-5-401, MCA; and felony assault by accountability, §§ 45-5-202 and 45-2-302, MCA.   On March 19, 1987, he was convicted by a jury of deliberate homicide under the felony murder rule, robbery and felony assault by accountability.   He was found not guilty of purposely and knowingly committing deliberate homicide.   He was sentenced as stated above.   A motion for new trial was filed June 22, 1987.   After a hearing, the District Court denied the motion for new trial on July 24, 1987.   Miller appeals.

On November 18, 1986, Miller and Sean Wentz went hunting after completing work for the same janitorial service.   They were drinking.   After failing to drop a deer that Miller shot at, they returned to Helena.   Wentz picked up his 12-guage shotgun and they purchased more beer.

Miller and Wentz then proceeded south from Helena. After hunting near Clancy for awhile, they went to Tings bar, in Jefferson City, and consumed more alcohol.   Miller suggested they go to Boulder Hot Springs.   The two departed at approximately 8:45 p.m. and arrived in Boulder at the Lounge bar.   During this portion of the trip, Wentz fired his shotgun four or five times out the window of Miller's white 1968 Volkswagen.

Once at the Lounge, Miller and Wentz drank tequila and received instructions to the hot springs from Terrance Duffy, the owner and bartender.   They headed south but could not find the resort.   Wentz testified that they agreed to a robbery plan about eleven miles south of Boulder and turned off the highway onto a lane that led to the Wortman family residence.   Miller claimed he turned off to urinate. He stated that the door to the car was open and he was unaware

3

of what Wentz was doing due to loud rock music from the car stereo. Wentz, with a shotgun, was observed by Bill Wortman, who opened the door to the trailer house when he heard dogs barking. Wortman, a 14 year-old-boy, testified that he was frightened and slammed the door when Wentz pointed the gun at him.

Wentz testified that he and Miller were at the trailer and Wentz had the shotgun. Marilyn Wortman testified to hearing a car start and seeing lights. She and another son, Shannon, both saw taillights. Marilyn called the police. Shannon Wortman also testified to finding a shotgun shell in the yard the next morning. The shell was taken by Mrs. Wortman to the Sheriff's Office and identified later at trial by experts as being ejected from Wentz's shotgun.

Deputy D.D. Craft responded to Wortman's call at 9:10 p.m. At approximately 9:15 to 9:20 p.m. he saw a white Volkswagen heading toward Boulder and radioed Chief of Police Dennis Sullivan. Sullivan testified to observing a white Volkswagen at the Lounge at approximately 9:20 p.m.

Wentz and Miller testified that they drove back to the Lounge in Boulder. Wentz claimed they returned for the purpose of robbing the bar. Wentz testified he brought the shotgun in to frighten the victims and that Miller entered the bar in front of him. He said Duffy came from around the bar and a struggle ensued. Wentz said Miller encouraged him to shoot Duffy. During the struggle, according to Wentz's first statement, the shotgun discharged. The County Attorney, John Conner, challenged Wentz as to conflicting previous statements and physical evidence. Wentz recanted this statement and testified that Miller grabbed the gun and shot Duffy. He said Miller handed the gun back to him and began picking up the spent shotgun shell when Marie Duffy entered the bar. According to Wentz, as Mrs. Duffy came into

4

the bar, Miller reached around him and pulled the trigger while Wentz held the gun.

Miller claimed they returned to the Lounge for further directions to Boulder Hot Springs. He stated that as he and Wentz sat drinking at the bar, Wentz and Duffy began to argue. Wentz left the bar and returned with the shotgun. Upon seeing the gun, Duffy struggled with Wentz and the gun fired. Miller said he went to the side of the bar next to a beam and did not see the actual shooting of Duffy because he was on his knees facing the wall.

After the shooting, Miller stated Wentz ordered him to retrieve the casing and threatened to shoot Miller if he did not comply. Miller claimed Mrs. Duffy then entered the rear of the bar and Wentz shot her. Miller claimed Wentz forced him to grab money from the cash register and some liquor bottles. Miller gave the cash to Wentz. The two returned to the Volkswagen and proceeded to Helena. Miller said Wentz claimed he killed 32 people in California, had made it 34 and could make it 35.

The local Boulder authorities were notified of the homicides at approximately 10:00 p.m. The Helena authorities were notified by an all points bulletin. Upon returning to Helena, Miller and Wentz proceeded to steal a Jeep and pickup at a local car dealership. They then drove the stolen vehicles to the residence of Tammy Harding, Wentz's fiancee. She testified that Wentz and Miller entered the apartment and Wentz told her two people were down in Boulder and Miller had shot them. At trial, inconsistent testimony was presented that Wentz told Harding he had shot the Duffys after Mr. Duffy and he had argued.

Wentz grabbed clothes and additional ammunition from the apartment. He and Miller then drove to a local car wash, left the Jeep and returned to the automobile dealership to

5

retrieve Miller's Volkswagen. Chester Richey, a fellow employee of Wentz and Miller for the janitorial service, testified Wentz was brandishing the shotgun when he returned to the dealership. Wentz told Richey not to call the police. Richey stated Miller did what Wentz told him.

After Wentz and Miller left Tammy Harding's residence the first time, she telephoned her father and he had his wife notify the Helena police to dispatch an officer to Tammy Harding's residence. Mr. Harding went to Tammy Harding's residence and testified to seeing the two vehicles return with "the black Chevy pickup coming first into the driveway." With Miller driving the Volkswagen and Wentz driving the pickup, the two did return to the circular driveway next to Harding's apartment but did not leave their vehicles. Miller claimed he drove to Harding's residence hoping the police would stop them on the street. Miller and Wentz sped away from the complex when they saw Helena Police Officer Brad Hampton through Tammy Harding's windows. The two individuals fled with Hampton in pursuit ultimately returning to the car wash.

Hampton testified that he stopped Wentz and told him to get on the ground face down. As Wentz did so, he threw some money and stated that Miller had done the shooting. Miller at this time did not stop but instead drove over a rocky embankment and onto the road heading away from the car wash. Miller was stopped shortly thereafter by officer Frank Melton who ordered Miller to go "down into a prone position on the ground" at which time keys to the stolen Jeep fell out of his pocket. These keys were found underneath Miller but he stated they were not his. Miller denied any knowledge as to why he was stopped.

Wentz, after being read his _Miranda_ rights, made several statements to the arresting officers and officers at

6

the Lewis and Clark County Jail to the effect that Miller had done the shootings. Wentz also gave a recorded statement to Jefferson County authorities. Miller denied that he was ever in Boulder but was too intoxicated to make any other statements.

After the trial and sentencing, Wentz, while incarcerated at the state prison, wrote two letters to defense counsel for Miller exculpating Miller of the crimes. In the letters Wentz admitted to contriving the robbery scheme, committing the murders and threatening Miller into assisting. At the hearing on the motion for a new trial, the District Court disallowed the letters saying they were hearsay and even if they were not, the court would not overturn the jury's decision.

## Motion to Change Venue

Miller contends the District Court erred in denying his motion to change venue. This motion was properly filed prior to trial and contained an affidavit and copies of newspaper articles about the murders.

Miller claims that an article that appeared in the December 4, 1986 Helena Independent Record, with a picture of Miller containing a caption "fingered as having fired fatal shoots" was inflammatory and prejudiced the jurors. He further argues that two stories in the Butte Montana Standard, November 20, 1986, and November 21, 1986, and a video tape from Helena's KTVH television station of the motion to change venue hearing on November 18, 1986, had the same impact on the jury population. Miller claims the District Court abused its discretion in failing to grant the motion because a reasonable possibility existed that Miller could not get a fair trial in Jefferson County.

Section 46-13-203(1), MCA, provides that a defendant "may move for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in such county." A defendant, who is seeking a change of venue on the grounds of prejudicial publicity, must prove two elements: (1) he must show that the news reports complained of were inflammatory; and (2) he must show that the publication or articles actually inflames the prejudice of the community to an extent that a reasonable possibility exists that he may not receive a fair trial. State v. Ritchson (1982), 199 Mont. 51, 54, 647 P.2d 830, 832; see, State v. Bashor (1980), 188 Mont. 397, 403-407, 614 P.2d 470, 474. As we said in Ritchson, the first test focuses on the nature of the publicity while the second focuses on the effect.

Upon review, we look not to the amount of publicity but rather to whether the publicity is of sufficient inflammatory nature to generate a widespread belief among the community of guilt. This inflammatory nature must be proven by the defendant who alleges denial of a fair trial. See, State v. Holmes (1983), 207 Mont. 176, 181, 674 P.2d 1071, 1073; State v. Paisley (1983), 204 Mont. 191, 194, 663 P.2d 322, 324.

Denial of a motion for change of venue is not reversible error in the absence of an abuse of discretion by the trial court. State v. Smith (Mont. 1986), 715 P.2d 1301, 1309, 43 St.Rep. 449, 458; State v. Kirkaldie (1978), 179 Mont. 283, 587 P.2d 1298. We stated the proof required for a court to change venue as follows:

> A defendant seeking a change of venue must show that there is reasonable grounds to believe that a prejudicial atmosphere exists within the present venue which creates a reasonable

8

apprehension that he cannot receive a fair trial.

Ritchson, supra, 199 Mont. at 54, 647 P.2d at 832; State v. Link (Mont. 1981), 640 P.2d 366, 368, 38 St.Rep. 982, 985. Miller did not reach this burden of proof and the District Court did not abuse its discretion in denying his motion.

Miller's motion was supported by his counsel's affidavit stating facts in support of alleged prejudice. These facts included the following statements: (1) that the population of Jefferson County was so limited that it was "virtually impossible" to pick a jury that was not either acquainted or familiar with the Duffys; (2) that the crime was subject to substantial and continuing media coverage such that "it can be reasonably apprehended that a fair trial in Jefferson County cannot be had;" and (3) that the attached articles to the affidavit went beyond objective dissemination of information.

Review of the articles shows that the majority of the national papers were largely concentrating on the victims' famous son, Patrick Duffy, of the television program "Dallas." The local publications contained factual reports of information gathered from law enforcement officials, that was limited and accurate, or from court records that were public knowledge. The reports were factual, contained no editorializing and could not have served to inflame the prejudice of the community. State v. Dryman (1954), 127 Mont. 579, 581-583, 269 P.2d 796, 797-798.

The affidavit was conclusory in nature and failed to show a connection between any inflammatory articles and possible prejudice of the community. Mere allegation of inflammatory material is insufficient if the second requirement enunciated in Ritchson, supra, is not proven,

9

e.g., that the articles actually inflamed community prejudice to such an extent that a fair trial was impossible.

The defense made no inquiry at voir dire as to whether any of the jurors had been influenced by the articles. There was nothing established in voir dire to show the existence of the "indicia of prejudice" we have required to support a motion for a change of venue. See, State v. Armstrong (1980), 189 Mont. 407, 423, 616 P.2d 341, 350; State v. Board (1959), 135 Mont. 139, 143, 337 P.2d 924, 927.

At voir dire a number of jurors admitted knowing some witnesses. Miller argues that People v. Tidwell (Cal. 1970), 473 P.2d 748, supports his contention where witnesses are known by the jury that this interferes with the defendant's right to a fair trial. However, Tidwell is easily distinguishable in that there was press exposure based on "investigating officers [keeping] the press and hence the public, apprised of virtually every step in the progress of their investigation." Tidwell, supra, 473 P.2d at 750. Further, one-third of the twelve-person jury knew one or more of the homicide "victims." In this case, all four of the prospective jurors who knew the Duffys were removed by peremptory challenge. At any rate, "[k]nowledge on the part of jurors is not sufficient and cannot be equated with prejudice." Smith, supra, 715 P.2d at 1309.

We have approved of the use of voir dire to demonstrate prejudice. State v. Nichols (Mont. 1987), 734 P.2d 170, 174, 44 St.Rep. 382, 387. And in Holmes, supra, where all the jurors claimed they had heard of the defendant, but only two people were removed because they expressed prejudice, we held that the District Court had not abused its discretion in denying a motion for a change of venue.

We note that voir dire is not the sole method to be employed to determine whether prejudice exists. Paisley,

10

supra, 663 P.2d at 324; State ex rel. Coburn v. Bennet (1982), 202 Mont. 20, 32-33, 655 P.2d 502, 508. However, where no connection is made of inflammatory media coverage and an excessive community prejudice, e.g., through the use of surveys, voir dire is an appropriate arena where prejudice can be demonstrated.

Where the District Court has appropriately granted a change of venue, the connection between inflammatory news reports and the actual inflaming of community prejudice has been shown. In Paisley, supra, we held that the court appropriately granted a change of venue motion where a written report of a criminologist who surveyed the community's registered voters' opinions was submitted and there was extensive editorializing by the local newspaper against the defendant.

Miller argues that federal courts only require a showing of publicity that "so pervades the proceedings as to create a 'carnival atmosphere'" and defendant does not have to show identifiable prejudice. Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; Estes v. Texas (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; Rideau v. State of Louisiana (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663. We note that these cases involved significantly more proof of prejudice, including opinion polls, than was presented by Miller in this case.

The standard asserted by Miller presumes prejudice by pretrial publicity without requiring actual proof. Coleman v. Zant (11th Cir. 1983), 708 F.2d 541, 544. It has long been the law of this state that prejudice in a criminal case will not be presumed, but must appear from the denial or invasion of a substantial right from which the law imputes prejudice. State v. Steffans (1981), 195 Mont. 395, 636 P.2d 836; State v. Bubnash (1963), 142 Mont. 377, 382 P.2d 830.

11

## Limitation of Character Evidence Pertaining to Wentz

Miller claims that the District Court erred in disallowing Miller from presenting evidence of Wentz's character through the testimony of Chester Richey, who worked with both Miller and Wentz. Miller relies on Rule 404(c), M.R.Evid., which states:

> Evidence of a person's character or a trait of his character is admissible in cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense.

This rule has not been interpreted by this Court and has no federal counterpart. Statements in the Commission Comments, Rule 404, M.R.Evid. are of no assistance.

Miller asserts the evidence to be solicited from Richey would impeach Richey's statement that he was not "frightened" of Wentz, and would expose the inaccuracy of a number of other statements made by Richey. Upon review of the record, we note that the District Court allowed Miller to make an offer of proof. Counsel for Miller stated that he was going to present two statements involving Wentz's claim "about shooting niggers" and a comment that Wentz "was going to use the shotgun to blow trees out of the ground."

An offer of proof allows counsel the ability to get evidence on the record where the court determines that it should be excluded. "In case the ruling is one excluding evidence, the substance of the evidence [is] made known to the court by offer or [is] apparent from the context within which questions [are] asked." Rule 103(a)(2), M.R.Evid. An offer of proof should be specific as to the facts to be proven. Palmer v. McMaster (1891), 10 Mont. 390, 25 P. 1056. A trial court cannot commit error without the arguing party informing the court that a specific course of action is legally improper. There is no statement by Miller here as to

what facts were to be proven or that an alternative manner would be less objectionable.

The statements that Miller attempted to present to the jury were cumulative in that they came out in various forms, direct and indirect, throughout the trial after Richey testified. There was testimony presented through a police officer, defendant's witness Dave Johnson and through cross-examination of Wentz himself that Wentz was a member of the Arayan Brotherhood, a white supremacist organization. Although not allowed to impeach Richey directly on the stand at the time he wanted, Miller could have recalled the witness in his case-in-chief and presented the evidence once the compulsion defense was before the jury. Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Section 46-20-701(2), MCA. A review of the record shows the court's exclusion was not reversible error. State v. Gould (Mont. 1985), 704 P.2d 20, 30, 42 St.Rep. 946, 956; McGuinn v. State (1978), 177 Mont. 215, 223, 581 P.2d 417, 422; State v. Romero (1968), 161 Mont. 333, 341-342, 505 P.2d 1207, 1211-1212.

## Motion to Dismiss

Miller claims the District Court erred in denying his motion to dismiss Counts I and II dealing with purposely or knowingly killing the Duffys which he was required to defend but for which the jury found him not guilty. He further claims the court erred in denying his motion to dismiss in regards to Counts II, IV and V dealing with the deliberate homicide charges under the felony murder rule and robbery for which he was convicted. Miller's final claim at this juncture is the District Court erred in not granting his motion to dismiss Count VI on the issue of accountability for felony assault.

13

All of Miller's contentions are based on a claim of insufficient evidence to support the State's case. Section 46-16-403, MCA, which deals with motions to dismiss or directed verdicts shows that it is within the District Court's discretion whether to dismiss an action at the close of the State's case. State v. Longneck (1982), 201 Mont. 367, 373, 654 P.2d 977, 981; State v. White Water (Mont. 1981), 634 P.2d 636, 638, 38 St.Rep. 1664, 1666. The District Court's ruling will only be disturbed on appeal where an abuse of discretion is shown. State v. Smith (1980), 187 Mont. 245, 250, 609 P.2d 696, 698, overturned on other grounds, 685 P.2d 918. In construing the statute, the motion to dismiss is conditioned upon "insufficient evidence" to support a finding of guilty. The motion "should be granted only where there is no evidence upon which a trier of fact could base a verdict." State v. Matson (Mont. 1987), 736 P.2d 971, 974, 44 St.Rep. 874, 877, citing State v. White Water, supra, 634 P.2d at 638.

In State v. Roberts (1981), 633 P.2d 1214, 1218-1219, 38 St.Rep. 1551, 1556, we quoted the language of Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573, to set out the required standard for sufficient evidence stating:

> [T]he relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Miller argues that insufficient evidence was presented to support any of the above stated Counts. We disagree and find that the District Court did not abuse its discretion in denying the motions to dismiss.

14

Miller argues no corroborating evidence existed and therefore Wentz's testimony, that especially connected Miller with the deliberate homicide of the Duffys, should not have been admitted because Miller claims no reasonable person could have found Miller purposely or knowingly killed either Duffy. Section 46-16-213, MCA, states that a conviction cannot be had on the testimony of one responsible or legally accountable for the same offense (§ 45-2-301, MCA, defines accountability) unless corroborating testimony, which is not sufficient if it merely shows commission of the offense or the circumstances, is presented. "[C]orroboration is sufficient if, 'unaided by the testimony of an accomplice, it tends to connect the defendant with the commission of the offense.'" State v. Morse (Mont. 1987), 746 P.2d 108, 113, 44 St.Rep. 1919, 1926, citing, State v. Gonyea (Mont. 1987), 730 P.2d 424, 427, 44 St.Rep. 39, 42.

> Whether evidence is sufficient to corroborate the testimony of an accomplice is a question of law. The evidence must show more than the fact that a crime was committed. It must raise more than a suspicion concerning defendant's involvement in the crime. However, it need not be sufficient, on its face, to support a prima facie case against defendant. State v. Kemp (1979), 182 Mont. 383, 386-387, 597 P.2d 96, 99. The evidence need only "tend to connect" defendant with the crime. State v. Mitchell (Mont. 1981), 625 P.2d 1155, 1158, 38 St.Rep. 487, 489-490. Further, the evidence may be circumstantial and it may come from the defendant or his witness.

State v. Cain (Mont. 1986), 718 P.2d 654, 656, 43 St.Rep. 842, 844.

The jury was presented with ample corroborating evidence connecting Miller to the Duffy murders and the

15

felonious assault at the Wortman residence prior to the testimony of Wentz.

Miller and Wentz were seen together a number of times by numerous individuals on November 18, 1986. They were together when Wentz picked up his shotgun. They were identified by the bartender at Ting's bar in Jefferson City. They were seen shortly thereafter at the Lounge bar in Boulder. Bill Wortman identified Wentz as being on their property and the testimony of the Wortmans' connected Miller's car to that activity. Officer D.D. Craft, responding to the Wortmans' call, identified a white Volkswagen heading towards Boulder. Boulder Police Chief Sullivan saw a white Volkswagen parked outside the Lounge shortly after 9:15 p.m. that evening. Gunshots were heard by Fred May, an employee at the Montana Developmental Center in Boulder, at approximately 9:30 to 9:45 p.m. as he walked to work. Julie Sampson, a nurse at the Montana Development Center, noticed a white Volkswagen parked in front of the Lounge with its driver's side door open at approximately the same time.

Miller and Wentz were together at the local car dealership in Helena where they broke in and left in a Jeep and pickup. Miller was seen driving the Jeep that was later abandoned at Zig's Car Wash. He was observed at this time following a black Chevrolet pickup which matched the description of the vehicle Wentz was driving. The operative word here being "following" Wentz. Miller attempted to keep Wentz quiet about any of the night's events at Tammy Harding's apartment. Miller also made statements to the extent that the two should blow up the stolen vehicles.

Chester Richey identified Miller and Wentz together when the two returned to the local car dealership to get Miller's Volkswagen. After returning to Harding's residence,

where Miller was again seen "following" Wentz, the two fled when they noticed a police officer. After finally being stopped by the Helena police, Miller portrayed, not someone under compulsion to commit crimes, but a person who had no idea why he was stopped. The arresting officer saw no sign of force or intimidation exercised by Wentz over Miller. Miller told the arresting officer that he had no knowledge about the Jeep keys found under his body. At the Lewis and Clark County Jail, Miller stated he had never been to Boulder and asked again why he was detained.

All of this evidence, although it does not create a prima facie case against Miller, tends to connect him with the charged crimes. Miller argues that State v. Bradford (Mont. 1984), 683 P.2d 924, 41 St.Rep. 962, stands for the proposition that "mere presence is not enough to prove accountability." This characterization of Bradford is only partially accurate. The actual quote of this case is:

> Although mere presence at the scene of a crime is not enough to establish accountability, the accused need not take an active part in any overt criminal acts to be adjudged criminally liable for the acts. [Citing, State v. Hart (Mont. 1981), 625 P.2d 21, 38 St.Rep. 133]. (Emphasis added.)

Bradford, supra, 683 P.2d at 930.

The above cited corroborative evidence shows the jury could infer that Miller was involved in the crimes at the Lounge and the Wortmans'. It also shows the jury could find Miller had opportunity to escape from any force or intimidation of Wentz numerous times but instead acted in concert. The corroborative evidence shows that Miller and Wentz could have acted in concert in the felonious assault of Billy Wortman, in the robbery and murder of the Duffys, and even, although the jury did not so find, that Miller had the

17

opportunity and motive to purposely and knowingly commit deliberate homicide.

The State admits that much of the evidence connecting Miller with the various charges was circumstantial but we have held numerous times that circumstantial evidence is sufficient to support a conviction. Roberts, supra, 633 P.2d at 1218; State v. Johnson (1982), 197 Mont. 122, 127, 641 P.2d 462, 465-466; State v. Fitzpatrick (1973), 163 Mont. 220, 225, 516 P.2d 605, 609. However, in this instance, as "[w]e stated in Fitzpatrick, supra, that to justify a conviction in a case based solely on circumstantial evidence, the facts and circumstances must not only be entirely consistent with the theory of guilt, but must be inconsistent with any other rational (reasonable) conclusion." State v. Lucero (Mont. 1984), 693 P.2d 511, 513, 41 St.Rep. 2509, 2511-2512.

With this statement that the evidence must be inconsistent with any other reasonable conclusion, we must look to the jury's verdict and the additional evidence presented. Once the corroborative evidence was presented, Wentz recited a version of the story much different from Miller's. Under Wentz's story, Miller could possibly have been convicted under Counts I and III for purposely and knowingly killing the Duffys. There was also substantial scientific evidence that was submitted that further supported the fact that the shotgun had chambered and ejected shells found at the Helena car dealership, the Lounge and the Wortmans' residence. Blood stains on Miller's pants matched the blood of Terrance Duffy. Various glass fragments from the Lounge and the car dealership were found on Miller's person.

18

The jury convicted Miller of deliberate homicide under the felony murder rule meaning they did not believe Wentz's version of the crime.

> As this Court has held many times over, the jury is the fact finding body in our system of jurisprudence, and its decision is controlling. The jury is free to consider all the evidence presented and to pick and choose which of the witnesses it wishes to believe. If sufficient testimony was introduced, as well as exhibits to justify the jury's findings, then its conclusions will not be disturbed unless it is apparent there was a clear misunderstanding by the jury or that there was a misrepresentation made to the jury.

Lucero, supra, 693 P.2d at 513.

There is an absence of misunderstanding on the part of the jury and no misrepresentation is alleged by Miller. As the State appropriately points out, it submitted over 1,100 pages of testimony elicited from 31 separate witnesses and over 100 exhibits. The jury was free to pick and choose to believe any or all of this material. Sufficient evidence was submitted to support the District Court's denial of the motions to dismiss at the close of the State's case-in-chief.

## Failure to Comply With Discovery

In anticipation of codefendant Wentz taking the stand, counsel for Miller commissioned a private investigator to prepare a report to be used for impeachment during cross-examination. Although the defense was to provide "a list of all papers, documents, photographs, and other tangible objects which the defendant [planned to] use at trial either as evidence or as a source of impeachment," counsel failed to provide the State with the private investigator's report. The District Court refused to permit

counsel to examine Wentz with the information contained in the report. Miller contends the investigator's report was attorney work product within the meaning of § 46-15-324, MCA, and therefore not subject to disclosure. We disagree.

The work product doctrine is a qualified evidentiary privilege which reflects the actualities of an adversarial system by extending limited protection to an attorney's efforts on behalf of a client. Hickman v. Taylor (1947), 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed.2d 451. "At its core, the work product doctrine shelters the mental processes of an attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles (1975), 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141, 154. The reality of our legal system demands that the embraces of the protection also extend to agents of the attorney. However, the privilege is not inviolate. State ex rel. Carkulis v. District Court (Mont. 1987), 746 P.2d 604, 44 St.Rep. 1954.

Nor is the scope of the work product doctrine so broad as to encompass substantial evidence.

> There is no doubt that if an attorney uses at trial a statement he obtained and prepared in anticipation of litigation in interrogating or cross examining a witness, the full statement, even though work-product, must be produced at the demand of the other side. [Citation omitted.] By the use of the statement at trial, the attorney has waived the work-product protection, since the material in the statement has become substantive evidence.

Carkulis, 746 P.2d at 613-614. Counsel's election to use the material contained within the investigator's report clearly constituted a waiver of the work product privilege. His attempt to label the report "impeachment material" is not

sufficient to escape discovery. See Hickman, supra, (recognizing that impeachment and corroboration material is subject to discovery).

In a related argument, Miller contends discovery applies only to exhibits. However, contrary to Miller's assertion, there is no indication that Montana's discovery statutes were designed to limit disclosure to exhibits. Section § 46-15-323(4), MCA, provides for production of papers and documents "which he will use at trial," not merely those documents that will be offered as exhibits. Consistent with the goal of achieving justice, Montana's discovery scheme has inherently rejected the theory of trial by ambush. See, State v. Waters (Mont. 1987), 743 P.2d 617, 44 St.Rep. 705. The purpose of a criminal trial is to ascertain the truth. This aim is best realized through full disclosure and presentation of the evidence, not surprise attacks.

The investigator's report fell within the scope of § 46-15-323, MCA, and the State's discovery request. As such, the report should have been provided to the State. The District Court properly prohibited use of the report.

## Denial of Defendant's Exhibit I

The District Court denied Miller's Exhibit I which included diagrams and a written rendition by Miller of his version of the crimes. The State objected to the introduction of the document on the basis that it created "undue influence" on the jury. Miller claims the document was presented to show that his story was consistent with the stories he related in November and December of 1986 and showed that Miller did not "concoct" his version. The District Court denied admission of the document. Miller claims this was error.

21

The State did not object to the examination of Miller in regard to the story, nor did it object to any of the subject matter. However, the State did object to the introduction of the exhibit. The version set out on the document was presented once by Miller on the stand. It was then repeated a second and third time by Lorna and Judy Miller.

Miller was examined thoroughly by defense counsel and the recitation of his version was well before the jury. Further, defense counsel made it clear to the jury that the account was the same as Miller told him in December.

The court was informed by the State that to allow the document to go before the jury caused undue emphasis because it was like "[transcribing] the statements of every witness who testifies [to] have the jury look at them." In essence, the District Court limited repetitious testimony.

In State v. Brietenstein (1979), 180 Mont. 503, 591 P.2d 233, we held that the trial court did not abuse its discretion by excluding repetitious testimony under Rule 403. In State v. Short (Mont. 1985), 702 P.2d 979, 42 St.Rep. 1026, we upheld the court's exclusion of tapes that were merely cumulative. Citing, 31A C.J.S. Evidence, § 166. Miller was allowed to inform the jury that his testimonial rendition was consistent. No substantial right of Miller was affected by the court's disallowance of this document. Rule 103, M.R.Evid.

### Sufficient Evidence to Support the Jury Verdict

Miller contends the jury's verdict was not supported by substantial and credible evidence because, again, the only evidence showing Miller was involved in the robbery was the uncorroborated testimony of Wentz. Our discussion of the law and facts under the motions to dismiss issue demonstrates

22

Wentz's testimony was not the only evidence connecting Miller to the crimes charged.

The "test of evidence sufficient to warrant a directed verdict of acquittal [Miller's relief requested under the motions to dismiss issue] is the same as the test of sufficiency of evidence on appeal, i.e. whether, viewing the evidence in the light most favorable to the State, substantial evidence exists to support a verdict of guilty." State v. Goltz (1982), 197 Mont. 361, 372, 642 P.2d 1079, 1085. We will not invade the province of the jury when they are presented with varying stories. "[W]here the evidence is conflicting or doubtful, either as to [whether the witness for the State is an accomplice] or as to corroboration, the court should not invade the province of the jury." State v. Gonyea, supra, 730 P.2d at 426; citing, State v. Smith (1925), 75 Mont. 22, 27, 241 P. 522, 523. The test we apply to determine whether the jury's verdict is supported by sufficient evidence is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact, the jury could have found the requisite elements beyond a reasonable doubt. State v. McHugh, (Mont. 1985), 697 P.2d 466, 469, 42 St.Rep. 371, 374. We conclude the evidence presented, corroborating, circumstantial and direct, was sufficient to support the jury's verdict. This evidence is more thoroughly described above in our discussion on the motions to dismiss.

### Sentencing

The District Court sentenced Miller to a term of 75 years for his involvement in the murder of Terrance Duffy; 75 years for his involvement in the murder of Marie Duffy; and 20 years for robbery of the Duffys' bar, each term to be served consecutively. Miller contends that the imposition of

consecutive terms in connection with a single "episode" of criminal behavior violates the intent of § 46-18-401(4), MCA. Miller does not contest the 10 year sentence he received for felony assault by accountability because it was not a part of this "episode." Such an interpretation is in stark contrast to the plain language of the statute, however.

Although the compiler's comments suggest that concurrent sentences are generally favored, § 46-18-401(4), MCA, provides that "separate sentences for two or more offenses shall run concurrently <u>unless the court otherwise orders</u>." On its face, the statute clearly vests the District Court with the discretion to impose consecutive terms regardless of whether the criminal acts arose out of a single episode of misconduct. It has long been recognized that when interpreting a statute,

> [T]he intention of the legislature must first be determined from the plain meaning of the words used, and if interpretation of the statute can be so determined, the courts may not go further and apply any other means of interpretation.

Murphy for L. C. v. State (Mont. 1987), 748 P.2d 907, 908, 44 St.Rep. 2030, 2032; State v. Hubbard (1982), 200 Mont. 106, 111, 649 P.2d 1331, 1333; Dunphy v. Anaconda Co. (1968), 151 Mont. 76, 438 P.2d 660. We find the District Court acted within its discretion.

Miller also contends the District Court improperly designated him a dangerous offender for purposes of parole eligibility. Under Miller's reading of § 46-18-404(1), MCA, a sentencing court must find that a defendant has been convicted of a crime for which a sentence in excess of one year could have been imposed and he must also represent a substantial danger to society before the court can impose a

24

dangerous offender designation. This position is in effect, that a defendant who has not committed a felony within the preceding five years or is not a danger to society is entitled to a nondangerous designation. Again, we find such a construction at odds with the plain language the legislature chose to employ.

The legislature, in enacting a law, is presumed to have understood the ordinary and elementary rules of construction of the English language. State ex rel. Palagi v. Regan (1942), 113 Mont. 343, 126 P.2d 818. The statute in question, § 46-18-404(1), MCA, provides:

> (1) The sentencing court shall designate an offender a nondangerous offender for purposes of eligibility for parole under part 2 of chapter 23 if:
>
> (a) during the 5 years preceding the commission of the offense for which the offender is being sentenced the offender was neither convicted of nor incarcerated for an offense committed in this state or any other jurisdiction for which a sentence to a term of imprisonment in excess of 1 year could have been imposed; and
>
> (b) the court has determined, based on any presentence report and the evidence presented at the trial and the sentencing hearing, that the offender does not represent a substantial danger to other persons or society. (Emphasis added.)

The legislature's use of the conjunctive "and" clearly indicates an intent to establish two mandatory prerequisites to a nondangerous designation: (1) lack of a felony conviction within the preceding five years; and (2) a finding that the defendant does not present a substantial danger to society. The court's duty is "simply to ascertain and declare what is in terms or in substance contained [within a

25

statute]." Section 1-2-101, MCA. We will not insert the disjunctive "or" when the legislature chose to employ the conjunctive "and." Such is not the function of this Court. We hold the District Court correctly applied § 46-18-404, MCA.

In Miller's tenth issue he contends he should be eligible for parole in 17½ years under § 46-23-201(1)(a), MCA. We have no record before us regarding the determination of parole eligibility for Miller. No argument concerning this issue occurred at the lower court level. Issues raised for the first time on appeal are untimely and will not be addressed by this Court. Section 46-20-104(2), MCA; State v. Probert (Mont. 1986), 719 P.2d 783, 43 St.Rep. 988; State v. Van Haele (1983), 207 Mont. 162, 675 P.2d 79.

## Motion for New Trial

Miller finally contends that the District Court erred in denying his motion for a new trial based on written statements submitted by Wentz to Miller's counsel in June of 1987 that exculpate Miller of the crimes. At the hearing on the motion for a new trial on July 13, 1987, Wentz invoked his Fifth Amendment rights and refused to testify. The court disallowed the letters ruling they were hearsay evidence. However, the District Court did exercise circumspection and stated the following in its memorandum attached to the order denying the motion:

> The Court holds that the WENTZ notes are hearsay and are not admissible under the cited exceptions (Mont.R.Evid. 804). The WENTZ statements clearly fail the test of credibility and trustworthiness and are blatantly self-serving. Since MILLER's conviction is on appeal, the Supreme Court will have the opportunity to pass upon the admissibilty of the WENTZ hearsay.

26

> Assuming, however, that the WENTZ hearsay
> was admissible, the Court still would
> have denied the request for a new trial.
>
> This Court is not going to void a jury
> verdict, based on a nine-day trial,
> involving some fifty witnesses and over
> one hundred exhibits. One of the
> witnesses was MILLER himself, and much of
> his testimony was unbelievable, being
> contradicted by the physical evidence and
> common sense and his own reputation for
> truth and veracity. (Emphasis added.)

The District Court went on to state that Wentz's statements contained no credibility and that Wentz's "dog wouldn't believe him." The court further pointed out that the circumstances surrounding the drafting of the letters was suspect because Wentz and Miller had opportunity to communicate with each other in prison and Wentz's "insatiable appetite for the limelight" could have been the motivating reason for the letters. The court stated the jury did not "believe" Wentz's story as evident by the verdict and to allow for a new trial would be an abuse of discretion on the court's part. Finally, the court noted that Miller's veracity was questionable because of his violation of the sentencing requirements that he not attempt to gain financially from the events. This statement was in regard to a letter Miller wrote to a national tabloid in which Miller proposed to sell his story.

The court closed with the statement:

> This Defendant's conduct, together with
> his prison liaison with WENTZ for the new
> trial strategy makes a mockery of his
> characterization of himself as an
> unwitting, innocent, misled and compelled
> victim in the events of November 18,
> 1986.

27

> The jury properly rejected that characterization when it found him guilty of assault, robbery and a participant in a double homicide. It would be the epitome of judicial arrogance to disturb that verdict on the "new evidence" offered, even if that evidence were admissible, which it is not.

Miller's claim of error is based on two propositions. First, that the District Court erred in disallowing the letters because the Rules of Evidence do not apply in a hearing on a motion for a new trial because it is a summary proceeding. Secondly, Miller argues the guidelines for a new trial, set out in State v. Greeno (1959), 135 Mont. 580, 342 P.2d 1052, were not considered by the court.

Initially, we note exclusion of the two letters by the District Court on the grounds of hearsay was error. However, it was not error on the grounds asserted by Miller. Where a witness pleads the Fifth Amendment and refuses to testify, he is considered unavailable. Rule 804(a)(1), M.R.Evid. This rule is identical to the Federal Rules of Evidence counterpart. The witness unavailable exception to the hearsay rule should have been applied by the District Court. See, U.S. v. Thomas (5th Cir. 1978), 571 F.2d 285, 288. A similar rule has also been applied by this Court. See, Sarsfield v. Sarsfield (1983), 206 Mont. 397, 407-408, 671 P.2d 595, 601.

Nonetheless, we find this to be harmless error in light of the court's explanation that a new trial would not be granted even if the material was not hearsay. Technical errors or defects in rulings on evidence in criminal prosecutions are not grounds for reversal, and in order to allow reversal, the ruling must affect substantial rights. Rule 103, M.R.Evid.; State v. Daniels (Mont. 1984), 682 P.2d 173, 41 St.Rep. 880; State v. Coleman (1978), 177 Mont. 1,

28

579 P.2d 732, appeal after remand, 185 Mont. 299, 605 P.2d 1000, cert. denied, 448 U.S. 914, 101 S.Ct. 34, 65 L.Ed.2d 1177. Further, Miller did not specifically object to the denial of the letters as an exception to hearsay because the witness was unavailable so the District Court was unable to consider this technical defect.

As to Miller's second claim that <u>Greeno</u>, supra, was not properly considered we note that § 46-16-702, MCA, provides that the District Court may grant a new trial "if required in the interest of justice." Miller's motion was based on "new evidence" sent to Miller's counsel and properly presented to the District Court. The new evidence presented by Miller was not available at the time of the original trial and therefore no opportunity existed for its presentation.

Where the District Court is faced with a determination of the appropriateness of a new trial based on newly discovered evidence, the following requisites must be met:

> (1) . . . the evidence must have come to the knowledge of the applicant since the trial;
>
> (2) that it was not through a want of diligence that it was not discovered earlier;
>
> (3) that <u>it</u> <u>is</u> <u>so material</u> that <u>it</u> <u>would</u> <u>probably produce</u> a <u>different result</u> <u>upon</u> <u>another trial;</u> (Emphasis added.)

State v. Pease (Mont. 1987), 740 P.2d 659, 665, 44 St.Rep. 1203, 1210; citing <u>Greeno</u>, 342 P.2d at 1055.

The material presented meets the first two enunciated tests. However, from a review of the evidence presented in the initial trial, the lack of veracity of both Miller and Wentz, and the District Court's ruling that even if presented, he would not grant a new trial, we find that the

29

District Court did not abuse its discretion in denying the new trial.

The District Court considered Wentz an unbelievable witness. The jury's verdict indicates they also did not believe Wentz. In State v. Cannon (Mont. 1984), 687 P.2d 705, 712, 41 St.Rep. 1659, 1667, we affirmed the court's denial of a new trial based on new evidence because the evidence presented "an additional inconsistency for consideration by the jury."

This is a similar situation. Is the jury to believe Wentz's statements to police officers upon arrest? Is the jury to believe Wentz's statements at the original trial? Is the jury to now believe Wentz's statements in the letters drafted after his introduction to prison society where he had opportunity to converse with Miller? The inconsistency is apparent and the submission of these letters cannot be said to be so material as to change the outcome of the jury's verdict in light of Wentz's lack of veracity.

Upon review of the evidence, the record, and the three-factor test enunciated above, although not specifically referred to by the District Court in name but applied in practice, we conclude the District Court did not abuse its discretion in denying the motion for a new trial.

The jury verdict and judgment of conviction and sentence are affirmed.

_____
Justice

We concur:

_____
Chief Justice

30

_John Conway Harrison_

_Fred J. Weber_

_L. C. McDonough_
_____
Justices


_C. B. McNeil_
_____
The Honorable C. B. McNeil,
District Judge, sitting for
Mr. Justice John C. Sheehy


_John M. McCarvel_
_____
The Honorable John M. McCarvel,
District Judge, sitting for
Mr. Justice William E. Hunt