NO.   93-114

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

---

STATE OF MONTANA,

      Plaintiff and Respondent,

   -vs-

GARY ALLEN COX,

      Defendant and Appellant.

---

APPEAL FROM:   District Court of the Third Judicial District,
              In and for the County of Powell,
              The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          J. Mayo Ashley, Attorney at Law, Helena, Montana;
          William F. Hooks, Appellate Defender's Office,
          Helena, Montana

      For Respondent:

          Hon. Joseph P. Mazurek, Attorney General, John P.
          Connor, Jr., Assistant Attorney General, Helena,
          Montana, Pamela P. Collins, Assistant Attorney
          General, Helena, Montana

          Christopher Miller, Powell County Attorney,
          Deer Lodge, Montana

---

FILED

AUG 9 - 1994

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Filed:

Submitted on Briefs:   June 24, 1994

Decided:   August 9, 1994

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Appellant Gary Alan Cox (Cox) appeals the Third Judicial District Court, Powell County, jury verdict convicting him of two counts of kidnapping, pursuant to § 45-5-302, MCA; burglary, pursuant to § 45-6-204, MCA; and five counts of deliberate homicide pursuant to § 45-5-102(1)(b), MCA, the felony murder rule. We affirm.

The following issues are presented on appeal:

1. Did the District Court abuse its discretion when it denied Cox's motion for an expert on prison conditions to assist with his compulsion defense?

2. Did the District Court err when it concluded that Cox was not denied due process when unmarked prison clothing was not preserved after the riot?

3. Did the District Court abuse its discretion when it denied Cox's motion to dismiss his felony murder charges?

4. Did the District Court abuse its discretion when it admitted into evidence autopsy photographs of the five protective custody victims?

A prison riot occurred at Montana State Prison on the morning of September 22, 1991. The riot began in the Maximum Security Unit (Unit) of the prison just after the morning exercise period when a sergeant and four floor officers were returning three inmates from exercise Yard Area number 5 to their cells. The Unit is a separate building which housed sixty-eight inmates, including Cox, at the

2

time of the riot. The Unit consisted of six housing blocks referred to by the letters A through F. Each Block consisted of sixteen cells. Exercise Yard Area number 5 was part of the interior open-air exercise area located within the confines of the Unit. At both ends of the Unit there were control cages guarded by officers who controlled "sally port" doors from the inside of these cages. (The sally port doors are designed for added security so that each door opens independently, allowing the first door to close before the second one opens onto a Block.)

On the morning of the riot, the officer guarding the west or "main" control cage opened the sally port doors to allow the three inmates back from the exercise area onto C Block. The west control cage guard testified that as he was opening the C Block doors, he noticed that eight or nine inmates, including Cox, were running through the door from the exercise yard and entering the Unit. The inmates had gained access to this area due to the fact that the chain link fence surrounding Yard 5, one of six interior open-air exercise areas, had been "worked" by some of the inmates over a period of time in order to weaken it and eventually allow them access through it. In addition, the first sally port door which led from Yard 5 into the building had not been immediately closed before the second inside door opened onto C Block.

According to some members of the prison community, the riot was not a spontaneous decision. The fact that the chain link fence had been "worked" indicates that at least some of the inmates were alert to possible opportunities to take action--although specific

plans may not have been formulated. Although Cox testified that he had not helped to **"work"** the fence prior to the day of the riot, he did admit to participating in a plan to **"cause** a little ruckus, tear some stuff up and draw attention to the conditions in Maximum Security." Be also admitted to prying open the fence on the day of the riot.

As the first inmates gained entrance into the Unit, one of the inmates propped open the electronic door, leading from the corridor to the inner door of the Unit, with a sand bucket used for cigarette butts. This enabled more inmates to enter the building. Some of the inmates attempted to enter the control cages. The two guards at these control cages, fearing for their lives, eventually exited through the escape hatches on the roof. The inmates continued their attempts to gain access to the control cages which contained the keys to the other cells. Although the control cages were protected by plexiglass shields, some of the inmates burned holes through the plexiglass of the east cage door and retrieved the cell keys inside. Later, inmates also gained access to the west cage. Eventually they were able to open all of the cell and Block doors to release the other inmates.

During the riot, the ten inmates on D Block of the Unit were particularly fearful because of their special status within the prison system. These inmates had been designated "protective custody" status due to the prison administration's determination that they were in need of protection from other inmates for either providing information to the prison administration on other

inmates, or because the types of crimes they had committed characterized them as being at risk within the prison hierarchy. These inmates were designated "close security" classification which entailed more freedom than "maximum security" classification. Because these inmates were cooperative within the prison system and did not have to be handcuffed or restrained outside of their cells, they were assigned special supervised tasks such as cleaning the Unit and doing the laundry. They were allowed more material privileges and possessions than the Maximum Security inmates, for example, they were permitted to have canned sodas and were allowed to wear khaki pants and shirts as distinguished from the Maximum Security inmates who were forced to wear orange jumpsuits.

According to the prison warden, protective custody inmates were housed in the same building as the Maximum Security inmates because the building was equipped with security devices, and, other than that building, there was no other viable option. The warden testified that in most state prison systems there are separate facilities for these inmates, but that the Montana prison system lacked sufficient funding to accommodate such a facility.

During the course of the riot, as the inmates were overtaking C Block, five stranded floor officers took refuge in lower C Block's shower area which consisted of a three-by-five foot cubicle. In order to further secure themselves inside this one-person shower area, they stuffed a water-soaked mattress in front of themselves and locked the door with the shower padlock. The mattress had become soaked by the automatic sprinkler system due to

5

fires started by the inmates. Eventually, all of the cell mates on C Block were freed. The five officers had no other option than to remain in this tiny shower throughout the course of the riot in order to protect themselves.

While the five officers were taking refuge in the shower area, two protective custody inmates, also fearing for their lives, barricaded themselves in the west laundry room for protection from the rioting maximum security inmates. The two protective custody inmates did not expect to survive the riot. While barricaded inside the laundry room, one of them wrote a list, on the clothes dryer, of five names of maximum security inmates. These were the names of the inmates who ware, allegedly, threats to the lives of the two protective custody inmates. Cox's name was on that list.

As the riot continued, the prison administration attempted to decipher the situation and develop a plan of action. The warden, ultimately responsible for the decision about when to enter the Unit, alerted the Disturbance Control Team, which consisted of specially trained correctional officers. At approximately 2:00 p.m., they entered the Unit through the escape hatches on the roof since the doors to the Unit were barricaded. They came out into the west end of the Unit, and regained control of the Unit one Block at a time, beginning with C Block. After retaking Blocks C, B, and A, the captain encountered a protective custody inmate who informed him that his friends in D Block were being murdered. The captain and another officer searched D Block and found the bodies of five protective custody inmates. They also found another inmate

who was still alive but whose throat had been slit. After securing D Block, the captain posted an officer at D Block to prevent tampering or destruction of evidence at the crime scene, and alerted the Criminal Investigation Bureau of the Department of Justice about the victims in D Block.

Because of the destruction done to the Unit, the inmates were moved to another area of the prison for several weeks. That afternoon, agents from the Criminal Investigation Bureau went through the Unit and collected evidence, and then notified the State Crime Lab in Missoula which, in turn, sent investigators. Autopsies were performed on the five deceased inmates, and it was determined that the causes of death were either multiple blunt force traumas to the head, ligature strangulations, incise wounds to the necks, or combinations thereof.

The riot lasted approximately four hours. Other than the two officers who escaped onto the roof, the five officers locked in the one-person shower in C Block, were the only correctional officers in the Unit who witnessed the events of those four hours. Several maximum security inmates, including Cox, were eventually charged and convicted for their roles in the riot of September 22, 1991.

I

Did the District Court abuse its discretion when it denied Cox's motion for an expert on prison conditions to assist with his compulsion defense?

Trial courts have broad discretion to determine the relevancy of evidence. We will not overturn this determination unless the

7

District Court abused its discretion.  state v. Hall (1990), 244 Mont. 161, 169, 797 P.2d 183, 188.

Section 45-2-212, MCA, states that in order to prove the defense of compulsion, the defendant must prove that the compulsion to perform the offensive conduct was caused by a threat or menace of imminent infliction of death or serious bodily harm.  State v. Owens (1979), 182 Mont. 338, 347, 597 P.2d 72, 77.  The defendant must also prove that his belief that death or bodily harm would be inflicted was a reasonable belief.  Section 45-2-212, MCA.

cox, in support of his defense of compulsion, moved to hire a an expert on prison conditions.  Cox also joined an existing motion, made by another defendant, for a mob psychology expert to assist with his defense.  In addition, Cox requested a separate private investigator to clarify any potential conflict among the defendants and witnesses testifying at trial.  Ultimately, the District Court, in its July 14, 1992 order allowed Cox's request for a separate private investigator, but denied Cox's motion for a prison conditions expert on the grounds, as set out in an earlier June 12, 1992 order, that the defense of compulsion imposes an objective standard rather than a subjective one and, therefore, any analysis of the effect of prison conditions on Cox's state of mind would be irrelevant to the defense of compulsion.  Accordingly, since Cox had indicated that the mob psychology expert would be of no value without the other two experts, the District Court also denied Cox's motion for that expert.

The compulsion defense merges  the common law defenses of

8

necessity, justification, compulsion, duress and "choice of two evils." City of Missoula v. Asbury (Mont. 1994), 873 P.2d 936, 938, 51 St.Rep. 383, 384, 873 P.2d 936, 938; citing State v. Ottwell (1989), 240 Mont. 376, 379, 784 P.2d 402, 404. Other state courts, such as the Wyoming Supreme Court, when considering the "reasonable fear" element of the defense theories of duress and coercion, have held that expert testimony on the effect of prison conditions on the defendant's state of mind would be irrelevant to those defenses. Amin v. State (Wyo. 1991), 811 P.2d 255, 260. In Amin, two inmates who were charged with kidnapping and aggravated assault and battery of state prison counselors, attempted to defend themselves by using the theories of duress and coercion. Amin, 811 P.2d at 260. The Wyoming Court held that these defendants were not entitled to present a physician/psychiatrist's conclusion that prison conditions caused them to commit certain acts in an attempt to save their lives. Amin, 811 P.2d at 259. We find this holding compelling and supportive of our decision here to affirm the District Court's denial of Cox's motion for a prison conditions expert to testify about Cox's subjective state of mind at the time of the riot. Accordingly, we hold that Cox's Sixth Amendment right to present a compulsion defense was not violated by the District Court's denial of his motions for additional experts because the testimony of such experts would be irrelevant to the compulsion defense.

Cox also contends that the testimony of the prison conditions expert would have benefitted his defense theory of mental disease

9

or defect. The District Court, however, is required only to appoint one qualified psychiatrist or licensed clinical psychologist when mental disease or defect is at issue. Section 46-14-202(1), MCA. The District Court, in denying Cox's motion, stated that a psychiatrist had already been appointed to determine Cox's mental state, including his ability to form the requisite mental state for the crime of burglary--the underlying crime of Cox's felony murder charges. We hold that the District Court did not abuse its discretion in denying Cox's request to present evidence of a prison conditions expert's testimony at trial.

II

Did the District Court err when it concluded that Cox was not denied due process when unmarked prison clothing was not preserved after the riot?

Cox contends that the District Court violated his due process rights when it failed to preserve alleged exculpatory evidence. Cox argues that, had the clothing he had worn during the riot been preserved, lack of victims' blood on his clothing would have proven that Cox had not been involved in the struggles with the protective custody victims.

We considered this same issue in the companion case of State v. Gollehon (1993), 262 Mont. 293, 304, 864 P.2d 1257, 1264, and held that it is well settled that, although a criminal defendant has a right to obtain exculpatory evidence, police officers are not required to procure evidence on behalf of a defendant. State v. Sadowski (1991), 247 Mont. 63, 79, 805 P.2d 537, 546. In order for

a defendant to be successful in a claim of per se violation of due process, that defendant must prove that the exculpatory evidence was deliberately or intentionally suppressed. Sadowski, 805 **P.2d** at 547. In addition, the defendant must prove that the suppressed material possessed an actual exculpatory value that was apparent before the destruction. State v. Halter **(1989),** 238 Mont. 408, 412, 777 **P.2d** 1313, 1316; quoting California v. Trombetta **(1984),** 467 U.S. 479, 488-89, 104 S.Ct. 2528, 2534, 81 **L.Ed.2d** 413, 422.

Here, there is no indication that any clothing was "apparently exculpatory" and intentionally destroyed in an effort to suppress evidence. In the aftermath of the riot, the inmates were ordered to strip in the event that any concealed weapons were in their possession. The prison administration was not yet convinced that the situation was under control. Given the circumstances, it was not unusual for clothing to be misplaced or destroyed during the chaos. The main priority was to prevent further violence. There is no evidence that any clothing was intentionally destroyed.

Finally, even if Cox could have secured his clothing and proven that there was no trace of victims' blood on his clothing, he would not have been exculpated for the murders of the protective custody inmates since he was being charged pursuant to § 45-5-102(1)(b), MCA, the "felony-murder" rule.

Cox was charged with deliberate homicide because he was found by the jury to be legally accountable for the commission of burglary and, during that burglary, he, or another person legally accountable for that burglary, caused the death of other human

11

beings.   Section 45-5-102(1)(b), MCA.   Proof that Cox actually committed the physical act that resulted in the death of any of the protective custody inmates is not required. Therefore, the lack of blood on Cox's clothing, if indeed it could have been proven, would not have been exculpatory evidence under § 45-5-102(1)(b), MCA. As in Gollehon, we conclude that the destruction of Cox's clothing does not constitute deliberate suppression of valuable exculpatory evidence.   Accordingly, Cox was not deprived of his constitutional right to due process.

III

Did the District Court abuse its discretion when it denied Cox's motion to dismiss his felony murder charges?

This Court will only disturb the District Court's ruling on a motion to dismiss upon a determination of an abuse of discretion. State v. Hedrick (1987), 229 Mont. 145, 150, 745 P.2d 355, 358.

Cox contends that no causal connection existed between his burglary charge and the five homicides because the evidence did not indicate that he or the other maximum security inmates actually planned to kill any protective custody inmates.   Intent to kill is not a prerequisite to being convicted under the felony murder rule. In fact, the purpose of the felony murder rule is to ensure that people who engage in dangerous acts likely to result in death are held responsible for any resulting deaths, whether or not the acts were planned or premeditated.   State v. Nichols (1987), 225 Mont. 438, 449, 734 P.2d 170, 176.   The felony murder rule creates an alternate means of holding one responsible for reckless actions

12

likely to result in death. The only causal connection required is that the death actually occurred during the underlying felony or the flight thereafter. Section 45-5-102(1)(b), MCA. Here, the five deaths occurred during the underlying burglary offense.

Cox was charged with burglary pursuant to § 45-6-204, MCA. According to that statute, a conviction is upheld if a person "knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein." Section 45-6-204, MCA. When Cox knowingly entered and remained in Block D without permission or supervision, he was "entering and remaining unlawfully" as defined in § 45-6-201, MCA, which states that "a person enters or remains unlawfully in or upon any . . . occupied structure, or premises when he is not licensed, invited, or otherwise privileged to do so." Section 45-2-101(40), MCA, defines "occupied structure" as "any building . . . suitable for human occupancy or night lodging of persons . . . ." Accordingly, the various Blocks of the prison are defined as "occupied structures." Gollehon, 864 P.2d at 1260-61.

As for the requirement, pursuant to § 45-6-204, MCA, that the defendant possess the "purpose to commit an offense therein," we conclude that Cox did possess such an intent. An "offense" is defined as any felony or misdemeanor. Section 45-2-101(42), MCA. Cox was charged, by information, with the offense of riot. Section 45-8-103(1), MCA, states, in relevant part, that a person commits the offense of riot when he purposely and knowingly engages in an act of violence or threat to commit an act of violence as part of

13

an assemblage of five or more persons, which act or threat presents a clear and present danger of or results in damage to property or injury to persons.

Cox had the intent to participate in the riot from the moment he entered the Unit. He himself testified, **"I** thought, yea, I thought the conditions in Max were bad enough that I would participate . . . and play my part in the riot . . . and face the consequences for **it."**

Cox admitted that he made a conscious choice to enter D Block, and did so knowingly. According to his testimony, he entered with **"maybe** as many as twenty-five or thirty people." These **"twenty-five** or thirty" inmates, according to Cox, possessed **"all** manner **of"** weapons. cox, carrying a **"stick"** as a weapon, **"barged"** into D Block with these other rioting inmates. These actions certainly constituted an **"act** of violence or threat to commit an act of violence as part of an assemblage of five or more persons," pursuant to **§ 45-8-103(1),** MCA. The outcome was the destruction of **property,** injury to persons, and five deaths.

Furthermore, Cox agreed that he himself created the **"fear** element" on D Block which caused the protective custody inmates to arm themselves in self-defense. He also admitted that it would not have surprised him if the protective custody inmates on D Block got "messed up or beat up a little **bit."**

We conclude that Cox committed the offense of burglary with intent to commit riot. Within the course of the riot, five protective custody inmates were murdered. Therefore, the

14

requisite causal connection existed between the commission of the underlying burglary offense and the murders of the five protective custody inmates. Accordingly, we hold that the District Court did not abuse its discretion when it denied Cox's motion to dismiss his felony murder charges.

IV

Did the District Court abuse its discretion when it admitted into evidence autopsy photographs of the five protective custody victims?

Cox contends that he was unfairly prejudiced when the State introduced twenty-one autopsy photographs, taken by the medical examiner, of the five protective custody victims. We addressed this identical issue as it related to the same set of photographs in the companion case of Gollehon, 864 P.2d at 1262-63. In that case, the argument was raised by defendant Gollehon and rejected by this Court.

When reviewing a trial court's evidentiary ruling, we will not overturn that trial court's determination of relevance or admissibility absent a showing of an abuse of discretion. State v. Crist (1992), 253 Mont. 442, 445, 833 P.2d 1052, 1054. When considering whether specific photographs should be admitted into evidence at trial, the trial court must weigh the probative value against the danger of unfair prejudice, and admit the evidence unless the danger of unfair prejudice substantially outweighs the probative value. Rule 403, M.R.Evid.

Cox contends that the photographs lacked probative value since

15

they did not provide the jury with any additional information or clarify any disputes. He argues that no disputes existed as to the identities of the victims, the nature or locations of the injuries, or the causes of death, and, therefore, the photographs lacked probative value. We disagree.

Here, as in Gollehon, the State contends that the selected photographs corroborated much of the inmates' testimony concerning Cox's actions and the actions of other maximum security prisoners during the riot. Gollehon, 864 P.2d at 1263. We conclude that the corroborative value of the photographs is indicative of their probative value. We have previously upheld the admissibility of photographs which accurately represented the victim's appearance at the autopsy and which were reasonably necessary to depict the multiplicity and extent of the injuries. State v. Powers (1982), 198 Mont. 289, 294, 645 P.2d 1357, 1360. We conclude that the photographs of the protective custody victims were accurate and reasonably necessary to depict the multiple wounds of the victims.

cox also contends that the brutality depicted in the photographs unduly prejudiced the jury. We reiterate our conclusion in Gollehon, in which we cited State v. Doll (1985), 214 Mont. 390, 400, 692 P.2d 473, 478: "[w]e will not demand that a trial be sanitized to the point that important and probative evidence must be excluded." Here, as in Gollehon, the State's method of selecting and displaying the photographs was intentionally designed to demonstrate the injuries while being as uninflammatory as possible. The medical examiner testified that,

August 9, 1994

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

J. Mayo Ashley
Attorney at Law
222 Broadway
Helena, MT 59601

William F. Hooks
Appellate Defender
P. 0. Box 200145, Capitol Station
Helena, MT 59620-0145

Hon. Joseph P. Mamrek, Attorney General
John P. Connor, Jr., Assistant
215 N. Sanders, Justice Bldg.
Helena, MT 59620

Christopher Miller
County Attorney
Powell County Courthouse
Deer Lodge, MT 59722

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy