No. 98-567

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 308

302 Mont. 415

14 P.3d 1237

STATE OF MONTANA,

Plaintiff and Respondent,

v.

KIPPY JOE HILL,

Defendant and Appellant.

APPEAL FROM: District Court of the Twenty-first Judicial District,

In and for the County of Ravalli,

The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

David E. Stenerson, Stenerson Law Office, Hamilton, Montana

Kirk Krutilla, Attorney at Law, Superior, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Jim Wheelis,

Assistant Attorney General, Helena, Montana

George H. Corn, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs: July 6, 2000
Decided: December 7, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 The Defendant, Kippy Joe Hill, was charged by Information filed in the District Court for the Twenty-First Judicial District in Ravalli County with the offense of deliberate homicide. The prosecution later added counts of sexual assault, attempted sexual assault, and an alternative deliberate homicide charge pursuant to § 45-5-102(1)(b), MCA (the felony murder statute). Hill pled not guilty to all charges. The jury found Hill guilty of deliberate homicide and not guilty of the remaining charges. Hill appeals from his conviction. We affirm the judgment of the District Court.

¶2 Hill presents the following issues on appeal:

¶3 (1) Did the District Court err when it denied Hill's motion for a pretrial psychological evaluation?

¶4 (2) Did the District Court err when it denied Hill's motion for a psychological autopsy of the victim?

¶5 (3) Did the District Court err when it denied the motion to suppress videotapes of Hill's statement to Ravalli County officers?

¶6 (4) Did the District Court err when it denied Hill's motion for a poll conducted at state expense and for change of venue?

¶7 (5) Did the Ravalli County Attorney commit prosecutorial misconduct by

disseminating information to the public despite a Justice Court order prohibiting further disclosure?

## FACTUAL BACKGROUND

¶8 On the morning of June 30, 1996, Scott Camper found the body of his mother, Laurel Camper, in her bedroom in Hamilton, Montana. Ravalli County Sheriff's Detective Sterling Maus arrived shortly thereafter and observed Laurel lying facedown on her bed. Scott Camper told Detective Maus that his sister, Christine Dunaway, and her boyfriend, the Defendant Kippy Joe Hill, had been living with Laurel since December and that "things had been a little bit tense." Scott Camper told Maus that Dunaway and Hill probably had an argument with Laurel the night before and that the argument probably caused his mother's death. After an examination, Maus decided to remove the body to the Montana State Crime Lab in Missoula for an autopsy.

¶9 Dr. Gary Dale, the State Medical Examiner, telephoned Maus later that afternoon. Dr. Dale told Maus that Laurel's death looked suspicious. Maus returned to Laurel's house at 322 Doran Lane to secure the crime scene.

¶10 At approximately 4:50 p.m. on June 30, Hill arrived at the Doran Lane residence. Hill informed Maus that he had been at Laurel's house the previous evening from 8:00 to 9:30 p.m., but that he and Dunaway spent the night at the Hamilton residence of Dunaway's father and Laurel's exhusband, Dave Camper.

¶11 Detective Ed Zerbst went to Dave Camper's house later that evening to interview Hill and Dunaway. After consenting to a search of Dave Camper's house, Hill and Dunaway agreed to return to the sheriff's office for the interview. During the interview, which was videotaped, Hill denied seeing Laurel during the previous day.

¶12 On July 4, 1996, officers took hair samples from several members of Laurel's family, including Hill. While at the police station, Hill approached Zerbst and admitted that he had been at Laurel's house on the evening of June 29, but that he avoided a confrontation by remaining in his bedroom until Laurel was asleep. When asked why he did not initially tell the truth about being at Laurel's house, Hill said he was scared it might sound bad.

¶13 On July 10, 1996, the forensic laboratory informed the detectives that pubic hairs found on Laurel appeared to match samples taken from Hill. Detectives videotaped an

interview with Hill on July 16, 1996. Prior to the interview, Zerbst advised Hill of his *Miranda* rights. Hill then voluntarily signed a *Miranda* waiver form provided by Zerbst. At various points during the interview, Hill asked if he could see his children and Dunaway. He also said that he needed "some air, or something, man, some water. . . ." At no time, however, did Hill request an attorney or otherwise indicate his desire to terminate the interrogation. Hill was arrested for deliberate homicide and handcuffed. Sheriff Jay Printz continued the interview and Hill eventually admitted having a physical altercation with Laurel but claimed that she was alive when he left the house.

¶14 The State filed a Complaint in Ravalli County Justice Court on July 16, 1996. The Complaint accused Hill of deliberate homicide pursuant to § 45-5-102, MCA. Following Hill's arrest, area newspapers reported that Hill had confessed to the homicide and that Laurel was possibly the victim of sexual assault. Hill made an initial appearance with court appointed counsel before Ravalli County Justice of the Peace Edward Sperry on July 17, 1996. On July 18, 1996, the Justice Court granted Hill's motion to "limit the dissemination of factual and evidentiary information" to the public and the press.

¶15 On August 6, 1996, the State filed an Information in the Twenty-First Judicial District Court charging Hill with deliberate homicide pursuant to § 45-5-102, MCA. In light of the extensive press coverage, the District Court filed a restrictive order on August 16, 1996 which superseded the Justice Court's earlier restrictive order. The District Court order prohibited further dissemination of information about the case. This Court reversed the District Court order with a writ of supervisory control based in part on the "right to know" provision in Article II, Section 9 of the Montana Constitution. *See State ex rel. The Missoulian v. Montana Twenty-First Jud. Dist. Ct.* (1997), 281 Mont. 285, 933 P.2d 829.

¶16 On April 25, 1997, the Ravalli County Attorney filed an Amended Information, adding counts of sexual assault, or, alternatively, attempted sexual assault. A Second Amended Information was filed on June 26, 1997. The Second Amended Information added an alternative deliberate homicide charge pursuant to § 45-5-102(1)(b), MCA, alleging that the homicide occurred during a sexual or attempted sexual assault; both felonies.

¶17 Hill filed a Motion for State Funds for Psychological Evaluation and a Motion for State Funds to Employ Expert for Post-Mortem Psychological Autopsy on November 12, 1996. Hill moved for a change of venue and state funding for a poll to establish possible jury prejudice. Hill also moved to suppress the videotaped admission obtained by Ravalli

County law enforcement officers during questioning on July 16, 1996. The District Court denied all of these motions.

¶18 Hill pled not guilty to all counts. On October 29, 1997, the jury convicted Hill of deliberate homicide but returned not guilty verdicts on the sexual assault and attempted sexual assault counts. The District Court sentenced Hill to 100 years at the Montana State Prison, with a minimum of 25 years and conditional parole eligibility.

¶19 Hill now appeals the District Court orders which denied his motions for a psychological evaluation and psychological autopsy. He further appeals the District Court's denial of the motion to suppress his videotaped statements and the denial of his motion for change of venue and state-funded poll. Finally, Hill alleges that the Ravalli County Attorney committed prosecutorial misconduct by disclosing facts not previously known to the public while the Justice Court gag order was still in effect.

## DISCUSSION

## ISSUE 1

¶20 Did the District Court err when it denied Hill's motion for a pretrial psychological evaluation?

¶21 Motions requesting an examination by a psychiatrist where the existence of a mental disease or defect is not at issue fall within the discretion of the trial court. *State v. Cox*, (1994), 266 Mont. 110, 117-18, 879 P.2d 662, 666-67. We review discretionary trial court rulings for an abuse of discretion. *May v. First Nat'l Pawn Brokers, Ltd.* (1995), 270 Mont. 132, 134, 890 P.2d 386, 388.

¶22 Hill contends that the District Court erred when it denied his motion for a pretrial psychological examination. Hill argues that the District Court's order amounted to a denial of due process. In support of this argument, Hill cites the following rule established by the United States Supreme Court:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake v. Oklahoma* (1985), 470 U.S. 68, 83, 105 S. Ct. 1087, 1096, 84 L. Ed. 2d 53, 66.

Hill also relies on § 46-14-205, MCA, which provides that:

> If either the defendant or the prosecution wishes the defendant to be examined by a qualified psychiatrist or licensed clinical psychologist . . . to determine the defendant's fitness to proceed or whether the defendant had, at the time the offense was committed, a particular state of mind that is an essential element of the offense, the examiner shall be permitted to have reasonable access to the defendant for the purpose of the examination.

¶23 Hill concludes that the quoted language entitled him to a psychological evaluation as part of the affirmative defense of mitigated deliberate homicide pursuant to § 45-5-103(1), MCA, which permits the defendant to introduce evidence of extreme mental or emotional stress for which there was a reasonable explanation or excuse. However, the State's duty to provide meaningful assistance to indigent defendants does not encompass every conceivable defense strategy. Rather, the right to a psychological evaluation is a limited one and is invoked only when the defendant's mental state has been placed directly at issue.

¶24 Hill does not enjoy a statutory right to the appointment of a psychiatrist absent a preliminary showing of mental disease or defect. *See Cox*, 266 Mont. at 117-18, 879 P.2d at 666-67. In those limited instances where the defendant's mental state is directly at issue, § 46-14-202, MCA, grants the defendant a statutory right to psychological evaluation by a qualified psychiatrist appointed by the district court. Likewise, the statute cited by Hill, § 46-14-205, MCA, applies only after the defendant's mental state is at issue. Significantly, both §§ 46-14-202 and -205 are found in a section of the code entitled "Procedure When Mental Disease or Defect an Issue."

¶25 Hill's reliance on *Ake* is similarly misplaced. The Supreme Court's holding in *Ake* applies only upon a preliminary showing that the defendant's sanity will be an issue at trial. *Ake,* 470 U.S. at 74, 105 S. Ct. at 1091-92, 84 L. Ed. 2d at 60. Federal courts have consistently recognized that *Ake* does not require that an indigent defendant be afforded a psychological expert on request. "[A] defendant satisfies the threshold requirement of *Ake* only when he has made a factual showing sufficient to give the trial court reasonable ground to doubt his sanity at the time of the offense." *Williams v. Collins* (5th Cir. 1993), 989 F.2d 841, 845.

¶26 Hill did not place his mental condition directly at issue. In his Motion for State Funds for Psychological Evaluation, Hill argued:

> [T]he defendant's mental state in regard to offering a defense of mental disease or defect *will not be at issue in this case* because the defense will be challenging the admissibility of admissions made by the Defendant. In order to challenge such evidence, the Defense will need to show that Kippy Joe Hill is below average intelligence, that he is easily influenced by others, especially authoritative figures, that he wishes to please others and is easily led to admissions even if he did not commit an act.

(Emphasis added.)

Hill was charged with deliberate homicide and the State bore the initial burden of proving that Hill acted purposely or knowingly pursuant to the requirements of § 45-5-102(1)(a), MCA. The right to a psychological examination found in §§ 46-14-202 and -205 did not apply because Hill did not argue that the existence of a mental disease or defect precluded him from forming the requisite mental state of purposely or knowingly.

¶27 Hill further contends that "[t]he Court in *Park* implied that raising the defense of mitigated deliberate homicide entitled the defendant to a psychological evaluation." *See Park v. Sixth Judicial District Court*, 1998 MT 164, 289 Mont. 367, 961 P.2d 1267. We disagree. Our holding in *Park* did not recognize the right to a psychological examination for defendants who raise the affirmative defense of mitigated deliberate homicide. Rather, *Park* addressed the unrelated issue of whether the State was entitled to a psychological examination by its own expert in order to rebut psychological evidence offered by the defendant in support of a mitigated deliberate homicide defense. *Park,* ¶ 29.

¶28 We have previously found the exclusion of psychological testimony to be a violation of due process and held that psychological testimony is admissible to prove or disprove the state of mind of a defendant charged with deliberate homicide. *State v. Fish* (1980), 190 Mont. 461, 471-72, 621 P.2d 1072, 1078. *Fish*, however, concerned the admissibility of psychological evidence previously gathered at the initiative of the defendant, not the antecedent question of whether the State must appoint an expert to assist in the preparation of such testimony. Where, as here, the defendant has failed to place mental state directly at issue by alleging the existence of a mental disease or defect, the right to appointment of a psychiatrist outlined in §§ 46-14-202 and -205 does not attach. We conclude that the

District Court did not abuse its discretion when it denied Hill's Motion for State Funds for Psychological Evaluation. Accordingly, we affirm the judgment of the District Court. However, by doing so we do not mean to infer that trial courts may never exercise discretion to provide funds for a psychological examination except when required by statute.

## ISSUE 2

¶29 Did the District Court err when it denied Hill's motion for a psychological autopsy of the victim?

¶30 Hill appeals the denial of his motion for state funds to employ an expert to conduct a post-mortem psychological autopsy. We review discretionary trial court rulings for abuse of discretion. *May,* 270 Mont. at 134, 890 P.2d at 388.

¶31 Hill requested state funds to employ Dr. Robert Shea, a certified psychologist, in the preparation of a "Post-Mortem Psychological Autopsy" of the victim. Hill argued that such an evaluation was necessary "for the purpose of establishing the existence of mitigating factors in the causation of her death." As part of Hill's contention that any homicide was mitigated deliberate or negligent homicide, Hill sought to portray Laurel as a confrontational woman who constantly badgered and berated him. Hill claimed that Dr. Shea could offer an expert opinion based on Laurel's writings, past counseling, and interviews with family and friends. Ultimately, Hill hoped to demonstrate that Laurel's confrontational nature, when "juxtaposed to the mental capacity of the defendant," would support a finding of mitigated deliberate homicide or negligent homicide.

¶32 Hill does not enjoy a statutory right to state funds for a psychological autopsy. The issue here, much like the issue discussed in the preceding section, is whether the State must provide financial assistance to an indigent defendant who wishes to present mitigating evidence. For the same reasons set forth above, the decision fell within the discretion of the District Court.

¶33 Much of Hill's brief on this issue deals with the scientific validity of the post-mortem psychological autopsy. Even assuming the scientific validity of the method, however, Hill does not demonstrate the relevance of his proposed psychological analysis. Mitigated deliberate homicide is an affirmative defense which allows the defendant to demonstrate the influence of extreme mental or emotional stress for which there is reasonable

explanation or excuse. Section 45-5-103(2), MCA. The reasonableness of the explanation or excuse must be determined from the viewpoint of a reasonable person in the actor's situation. Section 45-5-103(1), MCA. Therefore, the focus of the mitigated deliberate homicide statute is on the *defendant's* mental state at the time of the offense.

¶34 However, the requested psychological autopsy of the *victim* is unrelated to Hill's mental state. Relevant evidence is any evidence having a tendency to make the existence of any important fact more or less probable. Rule 401, M.R.Evid. The psychological profile of Laurel Camper is not directly relevant to Hill's attempt to establish the existence of extreme mental or emotional stress in conjunction with a mitigated deliberate homicide defense. Consequently, we agree with the District Court's conclusion that the psychological autopsy would not make any issue in this matter more or less probable.

¶35 Moreover, the evidence Hill sought to elicit did not require expert interpretation. To be admissible, expert testimony must assist the trier of fact to understand the evidence or determine a fact in issue. Rule 702, M.R.Evid. Hill wanted to prove mitigation by illustrating Laurel's psychological makeup. Even without the requested psychological autopsy, the record contains numerous references to the victim's personality. The State did not offer evidence to contradict Hill's depiction of her behavior on the night of her death. Most importantly, there was no indication that Hill's depiction of Laurel's personality was beyond the understanding of the average juror. Hill presented evidence and the jury interpreted that evidence based on everyday life experiences, which include exposure to quarrelsome people. Therefore, expert testimony was not required to assist the jury's understanding of the victim's psychological profile and its effect on Hill's mental state at the time of the homicide. We conclude that the District Court did not abuse its discretion when it denied Hill's motion.

## ISSUE 3

¶36 Did the District Court err when it denied the motion to suppress videotapes of Hill's statement to Ravalli County officers?

¶37 Hill challenges the District Court's denial of his motion to suppress the videotaped admission taken by Ravalli County officers on July 16, 1996. We have recognized that "when a defendant raises the question of voluntariness, the State must prove by a preponderance of the evidence that the confession or admission was voluntarily obtained." *State v. Mayes* (1992), 251 Mont. 358, 376, 825 P.2d 1196, 1208; § 46-13-301(2), MCA.

The question of whether a defendant has given a voluntary confession "is largely a factual determination that is within the discretion of the district court." *State v. Grey* (1995), 274 Mont. 206, 209, 907 P.2d 951, 953. We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous, and whether those findings were correctly applied as a matter of law. *State v. Parker*, 1998 MT 6, ¶ 17, 287 Mont. 151, ¶ 17, 953 P.2d 692, ¶ 17.

¶38 Hill challenges the voluntariness of his confession based on insufficient *Miranda* warnings and the coercive tactics of the interviewing officers. Hill admits that *Miranda* warnings were given and that he signed a waiver form prior to the interview with Detective Zerbst on July 16, 1996. However, Hill now argues that the *Miranda* warnings were inadequate in several respects. Hill argues that the demeanor of the officers was misleading; that he was not put on notice that he was considered a suspect; that there was insufficient discussion of his constitutional rights; that the officers used coercive tactics; that Hill's repeated attempts to terminate the interview were ignored; and that he lacked the mental capacity to knowingly waive his rights. For these reasons, he contends that the videotaped confession should have been suppressed.

¶39 Prior to any questioning during a custodial interrogation, the subject must be informed of the right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Miranda v. Arizona* (1966) 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 707. An individual may waive these Fifth Amendment rights only if the waiver has been made voluntarily, knowingly, and intelligently. *Miranda* 384 U.S. at 44, 86 S. Ct. at 1612, 16 L. Ed. 2d at 707; *See also State v. Allies* (1979), 186 Mont. 99, 109, 606 P.2d 1043, 1049. The question of voluntariness depends on the totality of the circumstances. *State v. Lenon* (1977), 174 Mont. 264, 271, 570 P.2d 901, 906. In determining whether a confession is voluntary under the totality of circumstances test, courts consider the characteristics of the defendant and what transpired during the interview. *State v. Hermes* (1995), 273 Mont. 446, 449, 904 P.2d 587, 589. The following factors, among others, are considered as part of the totality of circumstances analysis: the defendant's age and level of education; the interrogation technique and whether the defendant was advised of his *Miranda* rights; the defendant's prior experience with the criminal justice system and police interrogation; and the defendant's background and experience. *Hermes*, 273 Mont. at 450, 904 P.2d at 589. These are the same factors discussed by Hill.

¶40 Hill received Miranda warnings prior to his interview with Detective Zerbst and

Sheriff Jay Printz on July 16, 1996. The record contains the following exchange between Zerbst and Hill:

Zerbst: Ok? so, I, ah, got a couple of Rights forms here, and we'll go ahead and do that quickly. I'm gonna do this, I'll just let you read along with me there.

Hill: Ok. Alright.

Zerbst: Alright, there's a spot for your initials on each one of those. Ok? Basically if you want to read along with me, it says: "I know that I have the right to remain silent . . . and if I give up the right to remain silent anything I say can and will be used against me in a court of law. That I have the right to talk to a lawyer and have a lawyer present while I'm being questioned. And if I cannot afford to hire a lawyer one will be appointed to represent me free of any cost to me. That I can decide at any time to exercise these rights and not answer any questions or make any statements and no one has threatened or mistreated me either by word or act to make me answer any questions or make any statements. No one gave, offered, or promised me anything whatsoever to answer any questions or make any statements. And I understand each of these rights and I have read this Warning and Waiver or had it read to me." Which we did both of.

Hill: Ok.

Zerbst: "I understand and know what I am doing and I am willing to answer these questions and make a statement." And if that's your wish go ahead and sign right there.

Hill: There you go.

The "voluntary statement Miranda warning waiver" form appears in the record complete with Hill's initials by each statement of rights and signed by Hill at the bottom.

¶41 Hill contends that the warnings issued by Zerbst were ineffectual. He claims that Zerbst's cavalier demeanor belied the serious nature of the interview and misled him to think he was not a suspect. Hill further argues that his low intelligence negated a voluntary waiver of his Fifth Amendment rights because he did not understand what he was doing.

Hill relies on *State v. Allies* (1979), 186 Mont. 99, 606 P.2d 1043 to support his argument that the officers utilized coercive tactics.

¶42 We consider the following facts relevant to the totality of circumstances test. Hill was found to have slightly below-average intelligence. However, the videotape Hill seeks to suppress shows Hill acting in a responsive and coherent manner. The trial transcript of his cross-examination by the prosecutor demonstrates that Hill was fully capable of understanding questions and formulating answers. We find no support for Hill's contention that his level of intelligence prevented him from understanding his *Miranda* rights and effectuating a waiver of those rights.

¶43 Nor were the interrogation techniques utilized by the officers at the July 16, 1996 interview overly coercive. In *Allies*, we threw out a confession that resulted from coercive interrogation techniques. However, comparison of the interview tactics used by the officers in *Allies* to the tactics used in this case leads us to conclude that *Allies* does not support Hill's argument.

¶44 Hill's interview with Ravalli County officers differs in almost every respect from the interview in *Allies*. Hill knew from the beginning that he was a suspect. Detectives interviewed Hill at the police station on the day Laurel's body was discovered. Hill subsequently changed his initial statement in order to deflect suspicion when he returned to the police station on July 4 to have hair samples taken.

¶45 Hill received adequate *Miranda* warnings immediately prior to the interview in question and indicated that he understood his rights by signing a waiver form. Hill appeared fully coherent throughout the videotape and stated that he was not under the influence of any intoxicants. Detective Zerbst did not mislead Hill about the evidence against him. Rather, Zerbst confronted Hill with physical evidence and asked him to explain the presence of his pubic hair on the body of the victim. Sheriff Printz and Detective Zerbst appealed to Hill's morality in asking for an admission but did not promise or threaten any particular treatment.

¶46 Hill did not request an attorney at any time during the interview. The expression of his desire to see his wife and children does not amount to a request for counsel. This Court has held that a request to "talk to someone" is equivalent to asking for an attorney. *State v. Johnson* (1986), 221 Mont. 503, 514, 719 P.2d 1248, 1255. However, in the context of Hill's interview it does not appear that his request to see Christine and his young children

was motivated by the desire to receive legal advice. Furthermore, Hill did not specifically request that the interview terminate. When he asked to see Christine, he was informed that she was present at the station, though he was not permitted to see her immediately. When he asked for water, the detectives brought him water within a reasonable time.

¶47 Finally, Hill had some prior experience with the police. Although his prior convictions were all misdemeanors, Hill had at least minimal exposure to the criminal justice system.

¶48 Considering the factors set forth in *Hermes*, we conclude that the totality of circumstances surrounding Hill's July 16, 1996 interview demonstrate the voluntariness of Hill's videotaped statement. The State met the burden of establishing the voluntariness of Hill's statement when it provided compelling evidence that Hill received his *Miranda* rights prior to the interview and waived those rights. Consequently, we affirm the District Court's denial of Hill's motion to suppress his videotaped statement.

## ISSUE 4

¶49 Did the District Court err when it denied Hill's motion for a poll conducted at state expense and for change of venue?

¶50 Hill challenges the District Court's denial of his motion for change of venue and state funds to conduct an opinion poll in support of the motion. This Court will reverse a district court's denial of a motion for change of venue only upon a showing of an abuse of discretion. *State v. Moore* (1994), 268 Mont. 20, 51, 885 P.2d 457, 477, *overruled on other grounds, State v. Gollehon* (1995), 274 Mont. 116, 122, 906 P.2d 697, 700.

¶51 Change of venue is permitted when "there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in the county." Section 46-13-203(1), MCA. The standard for change of venue is whether there is a reasonable apprehension that the defendant cannot receive a fair trial. *State v. Brandon* (1994), 264 Mont. 231, 246, 870 P.2d 734, 743. Motions for change of venue based on adverse publicity must demonstrate: (1) that the news reports were inflammatory; and (2) that the news reports actually inflamed the prejudice of the community to an extent that a reasonable possibility exists that the defendant may not receive a fair trial. *Moore*, 274 Mont. at 52, 906 P.2d at 477.

¶52 Hill based his motion for change of venue on the extensive press coverage of the homicide in Ravalli County and the surrounding area. Hill emphasized the prejudicial

effect of Sheriff Printz's reference to Hill's statement as a "confession" in local newspapers. Hill also requested state funds to support his motion for change of venue, arguing that the burden of demonstrating prejudice sufficient to preclude a fair trial necessitated an opinion poll in Ravalli County.

¶53 We conclude that Hill failed to satisfy both prongs of the test outlined in *Moore*. The record contains numerous newspaper articles, all of which seem to report the facts of the case with reasonable accuracy. We therefore agree with the trial court's assessment that "media coverage has been factual, there has been little if any editorializing or sensationalism, and the factual error concerning the alleged 'confession' is a stale story that the newspaper has not recently repeated."

¶54 As for the second prong of the *Moore* test, Hill failed to demonstrate that extensive press coverage resulted in actual prejudice in the community. In a criminal prosecution, the state as well as the accused enjoys a right to examine potential jurors on voir dire in order to select a jury able to judge the facts in issue without bias, prejudice, or partiality. 47 Am. Jur. 2d *Jury* § 189 (1995). We have supported the voir dire process as the most economical and logical way to determine whether an impartial jury can be found within the disputed venue. *See, e.g., State v. Nichols* (1987), 225 Mont. 438, 444-46, 734 P.2d 170, 173-75; *State v. Miller* (1988), 231 Mont. 497, 506-07, 757 P.2d 1275, 1281. Our determination that Hill failed to establish actual prejudice is supported by the fact that during jury selection defense counsel challenged only one potential juror for cause, and that juror had known the victim. Therefore, despite numerous questions concerning the prejudicial effect of media coverage during examination of the jurors, defense counsel did not encounter widespread prejudice among the potential jurors.

¶55 Hill made his motion for change of venue prior to trial and juror examination. A motion for change of venue may be granted prior to voir dire when the facts indicate inherent prejudice. *State ex rel. Coburn v. Bennet* (1982), 202 Mont. 20, 655 P.2d 502. In *Coburn*, the facts that indicated inherent prejudice against the defendant were angry citizens marching on the courthouse, public meetings, vandalism, and extrajudicial statements in the newspaper by county officials. *Coburn*, 202 Mont. at 30, 655 P.2d at 507. In stark contrast, the record here is devoid of any indicia of actual prejudice against Hill.

¶56 Hill argues that his motion for change of venue necessitated an opinion poll conducted with state funds. However, Hill cites no authority for the proposition that allegations of

prejudice as a basis for change of venue require the dispersal of state funds by a district court. Hill did not establish the inflammatory nature of media coverage, nor did he provide a factual basis for his contention that the community was so prejudiced that a fair trial was impossible. Accordingly, we conclude that the District Court did not abuse its discretion when it denied Hill's motions for a state-funded poll and for change of venue.

ISSUE 5

¶57 Did the Ravalli County Attorney commit prosecutorial misconduct by disseminating information to the public despite a Justice Court order prohibiting further disclosure?

¶58 Hill claims that the Ravalli County Attorney deliberately included facts not previously known to the public in support of the Amended Informations filed in the District Court. Hill argues that the County Attorney included prejudicial and unnecessary facts in his affidavit despite the Justice Court's order prohibiting such disclosure.

¶59 Hill does not present an issue subject to review by this Court because he did not request relief on this basis in the District Court. Furthermore, no prejudice from the prosecutor's disclosures has been demonstrated since Hill was acquitted of the amended charges in support of which the additional facts were provided.

¶60 For these reasons, the judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER